## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.:_____

MARI ROSENFELD,
MAX ALEXANDER INMAN,

      Plaintiffs,

v.

UNIVERSITY OF COLORADO, through the Regents of the University of Colorado, a body corporate;
JUSTIN SCHWARTZ, Chancellor of the University of Colorado Boulder, in his official capacity;
DEVIN CRAMER, Dean of Students and Associate Vice Chancellor for Student Affairs of the University of Colorado Boulder, in his individual capacity;
HOLLY NELSON, Deputy Dean of Students and Assistant Vice Chancellor of the University of Colorado Boulder, in her individual capacity,

      Defendants.

---

### COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND JURY DEMAND

---

Plaintiffs Mari Rosenfeld and Max Alexander Inman, through their counsel, Daniel D. Williams, Matthew A. Simonsen, and Ashlyn L. Hare of HUTCHINSON, BLACK AND COOK, LLC, file this Complaint and Jury Demand and aver as follows:

### INTRODUCTION

1.    Peaceful, anti-war protest is core First Amendment activity—particularly on "college and university campuses," which have long served as "one of the vital centers for the Nation's intellectual life." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 835-36 (1995). "Indeed, in times of great national discussion, such as during the height of the Vietnam War or the debate over the war in Iraq, college campuses serve as a stage for societal debate." *Bowman v. White*, 444 F.3d 967, 979 (8th Cir. 2006). Accordingly, the Supreme Court has long

rejected efforts to stifle or punish peaceful anti-war demonstrations on public university campuses. *See, e.g.*, *Hess v. Indiana*, 414 U.S. 105, 107-08 (1973); *Healy v. James*, 408 U.S. 169, 194 (1972).

2.      Yet Plaintiffs are being singled out based on their viewpoint and the content of their speech by Defendant University of Colorado Boulder and its administration in an effort to stifle further demonstrations calling for an end to Israel's now-fourteen-month attack in Gaza.

3.      On October 3, 2024, Plaintiffs participated in a brief, nonviolent student protest led by the student group Students for Justice in Palestine ("SJP") targeted at a career fair at the University of Colorado Boulder (the "University" or the "University of Colorado").

4.      In response, Defendants imposed a draconian sanction—excluding Plaintiffs from the University campus on an interim basis starting the next day and prior to any disciplinary proceedings or opportunity to be heard—and further, reported Plaintiffs to campus police and revoked SJP's recognition as a registered student organization.  Defendants maintained the interim exclusion of Plaintiffs from campus for nearly two months until after the Thanksgiving break had begun and the academic semester was winding down, well after obtaining security footage clearly demonstrating that any disruption of the job fair was inconsequential and extremely brief, and that Plaintiffs posed no threat to the University community.

5.      Through this action, Plaintiffs seek an injunction to prevent the University's silencing of Plaintiffs' speech from recurring, as well as damages caused by their exclusion from campus.

## PARTIES

6.      Plaintiff Mari Rosenfeld[1] is an undergraduate student and on-campus employee

---

[1] Ms. Rosenfeld is a transgender woman. Although she has not yet legally changed her name, she uses the first name Mari and is identified accordingly here. *See, e.g.*, *Fuentes v. Choate*, No. 24-CV-01377-NYW, 2024 WL 2978285, at *1 n.3 (D. Colo. June 13, 2024) (approving identification

currently living in off-campus housing in Boulder, Colorado and enrolled in her sophomore year at the University of Colorado.

7.      Plaintiff Max Inman is a former undergraduate student and current on-campus employee at the University of Colorado, where he recently graduated with his bachelor's degree in December 2024.  Mr. Inman is currently living in off-campus housing in Boulder, Colorado and intends to pursue graduate studies at the University of Colorado in the future.

8.      Defendant University of Colorado is an institution of higher education with its largest campus in Boulder, Colorado. The University of Colorado is governed through its Board of Regents, which is a body established by the Colorado Constitution, and which serves as the body corporate for the University of Colorado.

9.      Defendant Justin Schwartz ("Chancellor Schwartz") is the Chancellor of the University of Colorado. He has overall managerial responsibility for the University's Boulder campus, including its policies, procedures, and limitations on student expressive activity. He is being sued for injunctive relief in his official capacity.

10.      Defendant Devin Cramer ("Dean Cramer") is the Dean of Students and Associate Vice Chancellor for Student Affairs at the University of Colorado.

11.      Defendant Holly Nelson ("Dean Nelson") is the Deputy Dean of Students and Assistant Vice Chancellor for Student Affairs at the University of Colorado.

## JURISDICTION AND VENUE

12.      This action arises under the Constitution and laws of the United States and is brought pursuant to 28 U.S.C. §§ 1331, 1343, 1367.

---

of transgender litigant in caption and filings by preferred name only, notwithstanding lack of legal name change); *see also In re Knight*, 537 P.2d 1085, 1086 (Colo. App. 1975) ("At common law, a person could adopt another name at will. Statutes setting forth procedures to be followed in changing a name merely provide an additional method for making the change.").

13.     Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b), (e)(1) because all the events giving rise to the claims occurred within the District of Colorado.

## FACTUAL ALLEGATIONS

### The History of the War in Gaza

14.     Israel and Palestine have been in conflict since Palestinians were displaced by the creation of the State of Israel in 1948 following World War II. *Israel Gaza War: History of the Conflict Explained*, BBC (Apr. 5, 2024), https://www.bbc.com/news/newsbeat-44124396.

15.     The creation of the State of Israel forcibly expelled hundreds of thousands of Palestinians from their homes in an event known as the "Nakba." Over 400,000 Palestinians fled to the West Bank and the Gaza Strip, and the Gaza Strip quickly became one of the most densely populated areas in the world. *Palestine and the Palestinians*, BRITTANICA, https://www.britannica.com/place/Palestine/Resurgence-of-Palestinian-identity (last visited Dec. 23, 2024).

16.     Although the region has been embroiled in conflict for over a century, the ongoing war between Israel and Hamas—the extremist political organization that controlled the Gaza Strip for most of the past two decades—began on October 7, 2023. On that date, Hamas launched an attack on Israel that killed an estimated 1,139 people in Israel, with more than 250 people taken captive. Josef Federman & Issam Adwan, *Hamas Surprise Attack Out of Gaza Stuns Israel and Leaves Hundreds Dead in Fighting, Retaliation*, ASSOC. PRESS (Oct. 7, 2023, 9:32 PM), https://apnews.com/article/israel-palestinians-gaza-hamas-rockets-airstrikes-tel-aviv-11fb98655c256d54ecb5329284fc37d2.

17.     Since October 7, 2023, Israel has been engaged in an ongoing campaign causing the widespread destruction of the Gaza Strip. Israel's campaign has killed more than 45,000 Palestinians living in Gaza and wounded more than 107,000. *Palestinian Rights Committee*

*Bureay Welcomes Historic Resolution Requesting Advisory Opinion from International Court of Justice, Rejects Actions that Obstruct Aid*, UNITED NATIONS (Dec. 20, 2024), https://press.un.org/en/2024/gapal1476.doc.htm.

18.     At least two thirds of the Palestinian population killed by Israeli assaults were non-combatant women and children. *Gaza: Possible Atrocity Crimes Unfold, New UN Report Warns*, UNITED NATIONS (Nov. 8, 2024), https://news.un.org/en/story/2024/11/1156716.

19.     By September 2024, Israel had likewise destroyed or damaged approximately 66% of all structures in the Gaza Strip, including houses, mosques, schools, shops, and hospitals, with the ongoing destruction of Gaza continuing to this day. Sudev Kiyada et al., *Gaza In Rubble and Ruin*, REUTERS (Oct. 5, 2024, 6:30 PM), https://www.reuters.com/graphics/ISRAEL-PALESTINIANS/ANNIVERSARY-GAZA-RUBBLE/akveegbnlvr/

20.     A historic and steadfast ally to Israel, the United States has been financially supportive of the country's ongoing military ventures in Gaza and the West Bank.

21.     The United States has provided approximately 17.9 billion dollars in aid to the Israeli Defense Force (the "IDF") since October 7, 2023, with much of the funding for military financing, arms sales, and transferring of United States stockpiles and used equipment for Israeli use. Ellen Knickmeyer, *US Spends A Record $17.9 Billion on Military Aid to Israel Since Last Oct. 7*, ASSOC. PRESS (Oct. 7, 2024, 5:47 AM), https://apnews.com/article/israel-hamas-war-us-military-spending-8e6e5033f7a1334bf6e35f86e7040e14.

22.     Many American citizens have condemned the United States' unequivocal support of Israel's conduct in Gaza, with over 12,400 pro-Palestine demonstrations recorded in the United States since October 7, 2023. *See* Erica Chenoweth et al., *Protests in the United States on Palestine and Israel, 2023-2024*, SOCIAL MOVEMENT STUDIES (2024).

## The Role of First Amendment-Protected Student Activism on American University Campuses

23.     Students on college campuses have traditionally played a pivotal role in anti-war activism throughout American history dating back to the Vietnam War. They have been afforded broad protections to engage in First Amendment activity on their campuses. *See, e.g.*, *Healy v. James*, 408 U.S. 169 (1972).

24.     The conflict in Gaza continues this pattern of students speaking out in support of peace. Since the start of the war, pro-Palestine student organizations, such as Students for Justice in Palestine and Jewish Voice for Peace, have emerged across the country at prominent colleges and universities to advocate for a ceasefire and two-state solution, protest the United States' funding of Israel, and demand their universities divest from businesses that support Israel's conduct in Gaza.

25.     In response, pro-Palestine protestors and student organizations have been silenced and retaliated against by school administrations and governmental organizations. Isabelle Taft, *How Universities Cracked Down on Pro-Palestinian Activism*, N.Y. TIMES (Nov. 25, 2024), https://www.nytimes.com/2024/11/25/us/university-crackdowns-protests-israel-hamas-war.html.

26.     For example, at the University of Maryland, university administrators revoked permission for Students for Justice in Palestine to hold a vigil on October 7, 2024—the anniversary of the start of the war—after the university received a wave of complaints demanding the event be canceled. A federal court granted a preliminary injunction permitting the event to go forward, finding the administration's cancellation of the event likely violated the students' First Amendment rights. *See Univ. of Maryland Students for Just. in Palestine v. Bd. of Regents of Univ. Sys. of Maryland*, No. CV 24-2683 PJM, 2024 WL 4361863, at *1 (D. Md. Oct. 1, 2024) (granting preliminary injunctive relief).

27.    In Texas, although declining to award the specific injunctive relief requested, another federal court concluded that the plaintiffs demonstrated a high likelihood of succeeding on the merits of their claim that an overbroad prohibition of "antisemitism" in multiple public universities' speech policies amounted to unconstitutional viewpoint discrimination in violation of the First Amendment. *Students for Just. in Palestine, at Univ. of Houston v. Abbott*, No. 1:24-CV-523-RP, 2024 WL 4631301, at \*10 (W.D. Tex. Oct. 28, 2024).

28.    In California, a federal court held that the plaintiff had adequately pleaded a First Amendment retaliation claim against a law enforcement officer who she alleged used excessive force against her during a peaceful pro-Palestine protest in retaliation for her speech. *See McCullough v. City & Cnty. of San Francisco*, No. 24-CV-03260-JCS, 2024 WL 4353061, at \*5-6 (N.D. Cal. Sept. 30, 2024).

**<u>Students for Justice in Palestine Faces Disparate Treatment by University Administrators</u>**

29.    Students for Justice in Palestine ("SJP") is a national organization that supports over 350 assembled groups on college and university campuses across North America.

30.    SJP was formed specifically to fight for Palestinian liberation through political and educational action. Its activities include protesting the United States' funding and other support for Israel's ongoing assault on Gaza.

31.    The University of Colorado chapter of SJP organized as a student group in the summer of 2023 and was registered as an official student-led group at the University of Colorado in or around September of 2023.

32.    Student organizations officially registered with the University receive a variety of benefits such as funding for events, attendance at the University student organization fair, promotional benefits, and the ability to host registered events, with additional rights such as using amplified sound or music.

33.    Since its inception, SJP has sought to adhere to the University's campus rules and regulations while continuing to demonstrate publicly in furtherance of its mission.

34.    On or about August 28, 2024, SJP members met with Chancellor Shwartz, Dean Cramer, and D'Andra Mull (Vice Chancellor of Student Affairs) to discuss the University's policies on speech and protests, including the Campus Use of University Facilities ("CUUF") Procedures.

35.    Though initially scheduled for one hour, the meeting was cut short at 30 minutes by the administration, leaving SJP members with additional questions concerning relevant policies.

36.    Despite its desire to comply with the University's policies, SJP has been subject to extreme monitoring by the administration and abundant security presence at its planned events in an effort to minimize the reach of SJP's protest activities.

37.    For example, the University dispatched its Student Engagement Response Team ("SERT") and law enforcement officers to a peaceful vigil that SJP organized on October 7, 2024 to mourn the loss of innocent lives during the first year of the conflict in Gaza.

38.    SJP held a silent, sit-in protest in the University Engineering Center that was similarly patrolled by SERT, University administrators, and law enforcement officers. Those personnel failed to intervene when counter-protestors confronted SJP members using inappropriate language and hate speech.

39.    Upon information and belief, the University does not monitor and deploy law enforcement to all events hosted by other student organizations, such as Students Supporting Israel ("SSI").

40.    Upon information and belief, University administrators, including the Defendants, monitor SJP's social media accounts to ensure SERT and law enforcement are deployed to all of SJP's events, both registered events and informal gatherings, while other student organizations, do

8

not receive the same treatment.

41.     In tandem with its over-policing of SJP events, the University has repeatedly accused SJP of violating CUUF Procedures on "chalking"—which the University defines as "using chalk on sidewalks or other surfaces to write messages or draw pictures"—without substantiating evidence.

42.     SJP uses chalking to promote upcoming events and always includes its organization name in the messages, in accordance with CUUF Procedures.

43.     On one occasion, University administrators initiated a meeting with SJP leadership in which they accused SJP of writing unidentified chalked messages in violation of the CUUF Procedures.

44.     Many of the chalked messages SJP was accused of writing contained pro-Israel statements, and photos of the chalked messages were posted on the official Instagram account of SSI.

45.     Upon information and belief, SSI's violations of the University chalking were never addressed by the University.

46.     The University's constant threats of security and administrative punitive actions against SJP protesters chills Arab, Muslim, and pro-Palestine students from engaging in speech, protests, and demonstrations.

**Plaintiffs' Protest Took Place in a Traditional Public Forum for Student Protest**

47.     SJP's protest on October 3, 2024, took place outside of and inside the University Memorial Center ("UMC").

48.     The UMC, constructed in the 1950s, was specifically designed to be a place of collaboration for University of Colorado students.

49.     The UMC houses a variety of student services, such as the university bookstore,

9

student organization offices, and dining options.

50.    Student organizations often market and hold events at the UMC, including "tabling" during busy hours to recruit members and advertise upcoming events.

51.    Described as "the heart of campus," the UMC has long been used as a forum for public protest and debate. *About the UMC*, UNIV. OF COLO. BOULDER, https://www.colorado.edu/umc/about#umc/mission (last visited Jan. 2, 2025).

52.    In the late 1960s and 1970s, the UMC was home to numerous political demonstrations including boycotts, sit-ins, protests, and rallies. *UMC Mission Statement*, UNIV. OF COLO. BOULDER, https://www.colorado.edu/umc/mission#accordion-185414777-1 (last visited Jan 2. 2025).

53.    The University of Colorado's website states that "the UMC is an exciting center for activism" that "celebrate[s] diversity through food, dance, art, music and the free exchange of ideas." *About the UMC*, UNIV. OF COLO. BOULDER, https://www.colorado.edu/umc/about#umc/mission (last visited Jan 2. 2025).

54.    The UMC is a traditional public forum or designated public forum.

**Plaintiffs Engaged in First Amendment Protected Activity at a University Job Fair**

55.    On October 3, 2024, the University sponsored a science, technology, engineering and mathematics ("STEM") job fair that took place at the UMC Glenn Miller Ballroom.

56.    The job fair included companies such as Lockheed Martin and RTX (f/k/a/ Raytheon) that have contributed to the production of weapons used by the IDF against Palestinians in Gaza.

57.    Members of SJP planned to protest at the job fair to publicly object to the United States' support of Israel's campaign and to educate students who may have been unaware of the companies' links to the destruction of Gaza.

58.     In the days leading up to October 3, 2024, SJP members advertised the protest.

59.     Upon information and belief, upon learning of SJP's planned protest, Defendant Cramer arranged for law enforcement to cover the event.

60.     On October 3, 2024, at approximately 11:00 a.m., SJP members gathered near the Main Entrance of the UMC to prepare for the protest.



61.     The job fair was planned to start at 10:00 am and end at 4:00 pm.

62.     In preparation for the career fair, the University had erected a large tent enclosure on the South Terrace and a barrier separating the South Terrance from the walkway in front of the Main Entrance.

63.     Upon information and belief, this tent was available for use by recruiters attending the job fair, but the formal event for students was being held indoors in the Glenn Miller Ballroom

inside the UMC.

64.    The SJP members stayed near the Main Entrance of the UMC where several empty tables and chairs were located for students to convene, in a manner that did not impede access to the UMC or the large tent enclosure.

65.    At that time there were approximately eight members of SJP gathered at the Main Entrance to the UMC, including Plaintiff Rosenfeld.

66.    There was sufficient space for the students to protest at the Main Entrance without blocking the doors to enter and exit the building.

67.     There was sufficient space for the students to protest at the Main Entrance without blocking access to the large tent enclosure.

68.    Plaintiff Rosenfeld was chosen as acting "marshal" during the protest and was wearing a yellow vest for that role.

69.    SJP marshal duties include directing students arriving to join the protest, coordinating with any University officials and/or law enforcement, and otherwise ensuring that the protest runs smoothly.

70.    While Plaintiff Rosenfeld met students participating in the protest at the Main Entrance, Plaintiff Inman walked the perimeter of the area and gathered straggler students who were attempting to find the location for the protest.

71.    At approximately 11:30 am, at the direction of Defendant Cramer, members of SERT explained to the protesters that the South Terrace had been previously reserved and directed the students to move to the South Lawn to protest.

72.    SERT gave no similar instructions to the multitudes of non-protesting students passing through and/or lingering on the patio near the Main Entrance.

73.    SERT informed the student protesters that they were allowed to use the South Lawn

from 12:00 pm to 1:00 pm for their protest.

74.    In compliance with SERT's instruction, the members of SJP complied and moved to the South Lawn.

75.    Two counter-protesters also arrived and moved to the South Lawn area.

76.    The South Lawn was not an effective location for the protest because the protesting students were not visible to recruiters and students entering the job fair, as they would have been from the Main Entrance.

77.    The SJP had one large banner identifying SJP and saying, "Free Palestine, End the Occupation," roughly eight feet by three feet, which was held aloft by two students, along with several additional smaller signs.

78.    Around 11:30 am the group began to chant statements such as, "No more money for Israel's crimes," and "The occupation has got to go."

79.    At approximately 11:45 am, Plaintiff Inman rejoined the group.

80.    At approximately 12:00 pm, the protesting students began to use a bullhorn to amplify the chants, as allowed by the CUUF Procedures.

81.    Use of the bullhorn at 12:00 pm complied with the CUUF Procedures as had been previously explained to SJP.

82.    Plaintiff Inman took the bullhorn and began to speak to the crowd of students.

83.    He told the protesters that he was "going into the career fair if you want to join me."

84.    Ten students followed Plaintiffs Inman and Rosenfeld towards the UMC, with Plaintiff Inman walking in front with the bullhorn.

85.    At least one of the counter-protesters walked with them while filming the SJP members.

86.     SJP entered the UMC through the Main Entrance doors and turned right down a hallway leading to the Glenn Miller Ballroom's entrance.



87.     University policy permitted public access and use of the UMC by University students including Plaintiffs at that time.

88.     A woman who appeared to be assisting with the job fair noticed the students' procession and attempted to block the group from entering the Glenn Miller Ballroom. Other administrators joined her in trying to keep the students from coming in.

89.     Without touching any of the administrators, the students entered through the

unlocked doors, walking around the administrators.

90.     The protest group walked approximately ten feet into the Glenn Miller Ballroom.



*Glenn Miller Ballroom,* UNIV. OF COLO. BOULDER, https://www.colorado.edu/eventsplanning/event-planning/venues/ballroom (last visited Jan. 13, 2025).

91.     There were approximately three hundred people in the Glenn Miller Ballroom, mostly students meeting with recruiters.

92.     Plaintiff Inman made an announcement using his bullhorn, saying that "there are corporations profiting from the genocide in Palestine here today."

93.     The students participating in the job fair continued to meet with recruiters uninterrupted, notwithstanding Plaintiff Inman's statement.

94.     The Glenn Miller Ballroom was loud at the time because students were busy speaking with recruiters.

95.     Upon information and belief, only students and recruiters within an approximately 25-foot radius could hear what Plaintiff Inman was saying.

96.     Only the people very close to the Ballroom Entrance, within an approximately 10-

foot radius, appeared to pay any attention at all to the announcement.

97.    A nearby person in the crowd responded to Plaintiff Inman's announcement, stating that it was a "professional space" and indicating that the SJP members should leave.

98.    Plaintiff Inman responded that it was "not very professional to kill children."

99.    An administrator accompanied by a law enforcement officer then approached the group and requested that they leave the building.

100.    Acting as marshal, Plaintiff Rosenfeld spoke to the administrator and the law enforcement officer to confirm whether the request was an official order.

101.    The law enforcement officer told Plaintiff Rosenfeld that he was giving the SJP students a lawful order to leave the Glenn Miller Ballroom.

102.    Plaintiff Rosenfeld informed Plaintiff Inman, who concluded his statement and left the building.

103.    Less than a minute elapsed between the law enforcement officer's request for the students to leave the building and Plaintiffs' compliance with that instruction.

104.    In total, approximately 3-5 minutes elapsed between Plaintiffs entering the building and exiting the UMC to return to the South Lawn.

105.    Once at the South Lawn, the group continued to hold signs and chant for approximately 20 minutes before concluding the protest. All the while, they were being followed by pro-Israel counter-protesters.

**<u>Defendants Punished Plaintiffs For Engaging In First Amendment Protected Activity</u>**

106.    On October 4, 2024, the day following the protest, University administrators placed SJP in bad standing.

107.    University administrators cited alleged violations of the CUUF Procedures, including disruption of the career fair and the use of amplified sound, as the reason for placing SJP

in bad standing.

108.    The bad standing placement effectively barred SJP from operating as a recognized student organization.

109.    The bad standing placement diminished SJP's ability to continue engaging in protected First Amendment activity on campus.

110.    On October 4, 2023, the day immediately following the job fair, Defendant Nelson initiated Student Code of Conduct proceedings against Plaintiffs.

111.    Upon information and belief, Defendant Nelson was directed to initiate Student Code of Conduct proceedings by Defendant Cramer.

112.    The notices of Student Code of Conduct violations that Plaintiffs received from Defendant Nelson imposed an indefinite interim exclusion order on Plaintiffs that excluded them from "the entire campus, on-campus housing, and any University activities," with the exception of attending classes. The interim exclusion required Plaintiffs to arrive to class "no earlier than 10 minutes before class and leave no later than 10 minutes once class is concluded."

113.    The notice warned that violation of the interim exclusion would be considered trespassing and would result in the notification of law enforcement. Plaintiffs were further informed that violation could jeopardize their status as students at the University.

114.    The notices provided no opportunity for a hearing or appeal regarding the interim exclusion from campus.

115.    Defendants did not lift the interim exclusion until the commencement of Thanksgiving break, nearly two months after it was imposed.

116.    The interim exclusion from campus prohibited Plaintiffs from engaging in First Amendment protected activity on campus and outside of the classroom.

117.    In addition to stifling Plaintiffs' freedom of expression, Plaintiffs were also

prohibited from attending the on-campus portions of their jobs.

118.    Defendant Cramer filed a police report against Plaintiffs.

119.    The alleged offenses in the police report included: inference with staff, faculty, or students of an educational institution; trespass within public buildings; harassment, strikes, shoves, or kicks with intent to intimidate or harass another person, in whole or in part, because of that person's actual or perceived race, color, religion, ancestry, national origin, physical or mental disability, sexual orientation, or transgender identity; and unlawful conduct on public property.

120.    There is no good-faith basis to accuse Plaintiffs of having committed any of these offenses.

121.    The Boulder District Attorney has not prosecuted  Plaintiffs.

122.    Defendants caused the police report to be filed in a further effort to prevent Plaintiffs from engaging in First Amendment-protected speech activity at the University.

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**First Amendment Violation — Freedom Of Speech And Assembly**
**(Plaintiffs against Defendant Schwartz – Injunctive Relief)**

123.    Plaintiffs incorporate here by reference all of the preceding paragraphs.

124.    Defendant Schwartz acted under color of state law at all times relevant to the allegations in this Complaint.

125.    Defendant Schwartz is a "person" under 42 U.S.C. § 1983.

126.    Plaintiffs were engaged in First Amendment-protected expression during the October 3, 2024, protest at the UMC career fair.

127.    Plaintiffs' expression was on a matter of public concern and did not violate any law.

128.    Plaintiffs' expression occurred in a traditional public forum or designated public

forum.

129.    Defendant Schwartz is responsible for policies and procedures governing use of the University of Colorado campus that are overbroad, unreasonable, and not narrowly tailored to serve a significant government interest.

130.    The actions of Defendant Schwartz—specifically setting and/or maintaining policies, practices and procedures for the University that prohibit or impede pro-Palestine protests on campus—are likely to chill a person of ordinary firmness, including other University students, from engaging in activity protected by the First Amendment.

131.    Defendant Schwartz's actions and inactions are content-based and/or viewpoint-based restrictions of Plaintiffs' expression.

132.    Defendant Schwartz's actions are not reasonable time, place, and manner restrictions on speech.

133.    Given the ongoing pattern of suppression of speech in support of Palestine experienced by Plaintiffs during the fall 2024 semester, Plaintiffs reasonably expect such conduct to continue absent injunctive relief against Defendant Schwartz in his official capacity.

### SECOND CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### First Amendment Violation —Retaliation
### (Plaintiffs against Defendants Cramer and Nelson - Money Damages; Defendant Schwartz – Injunctive Relief)

134.    Plaintiff incorporates here by reference all of the preceding paragraphs.

135.    Defendants acted under color of state law at all times relevant to the allegations in this Complaint.

136.    Defendants are "persons" under 42 U.S.C. § 1983.

137.    Plaintiffs were engaged in First Amendment-protected expression during the October 3, 2024, protest at the UMC career fair.

138.    Plaintiffs' expression was on a matter of public concern and did not violate any law.

139.    Plaintiffs' expression occurred in a traditional public forum or designated public forum.

140.    Defendants Cramer and Nelson retaliated against Plaintiffs for engaging in First Amendment protected activity by imposing an immediate interim exclusion from campus, failing to lift that exclusion until after the commencement of the Thanksgiving holiday period, and seeking criminal charges against Plaintiffs.

141.    Defendants Cramer and Nelson's retaliatory actions are likely to chill a person of ordinary firmness, including other University students, from engaging in activity protected by the First Amendment.

142.    Defendants Cramer and Nelson engaged in this conduct intentionally, knowingly, willfully, wantonly, and in disregard of Plaintiff Rosenfeld's and Plaintiff Inman's constitutional rights.

143.    As a direct and proximate cause and consequence of the unconstitutional acts and omissions of Defendants Cramer and Nelson, described above, Plaintiffs suffered injuries, damages, and losses in amounts to be proved at trial.

144.    Plaintiffs seek an injunction against Defendant Schwartz requiring the removal of any disciplinary notations from Plaintiffs' University records concerning the protest on October 3, 2024.

**THIRD CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**First Amendment Violation – Prior Restraint**
**(Plaintiffs against Defendants Cramer and Nelson - Money Damages)**

145.    Plaintiff incorporates here by reference all of the preceding paragraphs.

146.     Defendants Cramer and Nelson acted under color of state law at all times relevant to the allegations in this Complaint.

147.     Defendants Cramer and Nelson are "persons" under 42 U.S.C. § 1983.

148.     The University of Colorado's campus, and in particular its outdoor venues and the UMC, is a traditional public forum or designated public forum.

149.     Plaintiffs intended to engage in First Amendment protected activity on a matter of public concern.

150.     Defendants Cramer and Nelson's actions in indefinitely excluding Plaintiffs from campus acted as an unconstitutional prior restraint on Plaintiffs' speech because they prohibited Plaintiffs from engaging in First Amendment protected activity on campus.

151.     Defendants Cramer and Nelson's actions in indefinitely excluding Plaintiffs from campus were overbroad, unreasonable, and not narrowly tailored to serve a significant government interest.

152.     Defendants Cramer and Nelson engaged in this conduct intentionally, knowingly, willfully, wantonly, and in disregard of Plaintiff Rosenfeld's and Plaintiff Inman's constitutional rights.

153.     As a direct and proximate cause and consequence of the unconstitutional acts and omissions of Defendants Cramer and Nelson, described above, Plaintiffs suffered injuries, damages, and losses in amounts to be proved at trial.

**FOURTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Fourteenth Amendment Violation – Due Process**
**(Plaintiffs against Defendants Cramer and Nelson - Money Damages)**

154.     Plaintiff incorporates here by reference all of the preceding paragraphs.

155.     Defendants Cramer and Nelson acted under color of state law at all times relevant

to the allegations in this Complaint.

156.    Defendants Cramer and Nelson are "persons" under 42 U.S.C. § 1983.

157.    Colo. Rev. Stat. § 23-5-144 provides that it is "a matter of statewide interest to protect the rights of students to exercise their freedom of speech on the campuses of public institutions of higher education."

158.    Defendants Cramer and Nelson denied Plaintiffs an opportunity to be heard prior to imposing an indefinite interim exclusion from campus.

159.    Defendants Cramer and Nelson's actions in indefinitely excluding Plaintiffs campus without a hearing deprived Plaintiffs of a liberty interest without due process of law.

160.    Defendants Cramer and Nelson engaged in this conduct intentionally, knowingly, willfully, wantonly, and in disregard of Plaintiff Rosenfeld's and Plaintiff Inman's constitutional rights.

161.    As a direct and proximate cause and consequence of the unconstitutional acts and omissions of Defendants Cramer and Nelson, described above, Plaintiffs suffered injuries, damages, and losses in amounts to be proved at trial.

**FIFTH CLAIM FOR RELIEF**
**Violation of C.R.S. 23-5-144**
**Freedom of Speech Violation**
**(Plaintiffs against the University – Injunctive Relief)**

162.    Plaintiff incorporates here by reference all of the preceding paragraphs.

163.    The Colorado general assembly, recognizing the importance of free speech on college campuses, has codified in statute its declaration that "student expression on the campuses of institutions of higher education is a vital component of the educational environment at these institutions of higher education and that promoting the free and unfettered exchange of ideas in this marketplace of ideas is one way in which these institutions of higher education fulfill their

educational missions." C.R.S. § 23-5-144(1)(a).

164.    Colorado statute protects expressive activities in "student forum[s]," which include outdoor spaces on college campuses as well as any "nonacademic and publicly open portion of a facility" that has been "traditionally made available to students for expressive purposes." C.R.S. § 23-5-144(2)(d).

165.    The UMC patios, hallways, anteroom in front of the Glenn Miller Ballroom, and the Glenn Miller Ballroom, qualify as student forums for purposes of C.R.S. § 23-5-144.

166.    In order to promote robust speech and debate on college campuses, Colorado statute provides:

> An institution of higher education shall not limit or restrict a student's expression in a student forum, including subjecting a student to disciplinary action resulting from his or her expression, because of the content or viewpoint of the expression or because of the reaction or opposition by listeners or observers to such expression.

C.R.S. § 23-5-144(3)(a).

167.    The University violated C.R.S. § 23-5-144(a)(3) through: its actions to limit or curtail SJP protests; its actions to deny Plaintiffs access to the UMC and the UMC South Terrace for protest activities; its interim exclusion of Plaintiffs from campus; its disciplinary proceedings against Plaintiffs; and by issuing a police report based on false allegations of criminal activity arising from the Plaintiffs' protest activity.

168.    Colorado statute authorizes any "student who has been denied access to a student forum for expressive purposes" to bring an action for injunction to enjoin future violations by the University, and to recover reasonable attorney's fees and costs.

169.    Plaintiffs were denied access to the UMC and its environs for expressive purposes.

170.    Plaintiffs expect that the University's ongoing campaign to stop or limit protests in support of Palestine will continue into the Spring 2025 semester and beyond.

171.    Plaintiffs seek an injunction prohibiting the University from barring pro-Palestine protests in the UMC and on the UMC South Terrace and prohibiting the University from commencing or continuing disciplinary proceedings against students for engaging in protest activity authorized by C.R.S. § 23-5-144 in support of Palestinian rights.

172.    Plaintiffs seek an injunction against Defendant University requiring the removal of any disciplinary notations from Plaintiffs' University records concerning the protest on October 3, 2024.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court enter judgment in their favor and against each Defendant, and award them all relief allowed by law, including but not limited to the following:

A.    Against Defendants Cramer and Nelson, actual economic damages including for loss of access to University facilities notwithstanding payment of fees for such access, loss of income by being prohibited from on-campus workplaces, and as otherwise determined at trial;

B.    Against Defendants Cramer and Nelson, noneconomic damages, including damages for emotional distress, humiliation, and loss of enjoyment of life in an amount to be determined at trial;

C.    Against Defendants Cramer and Nelson, punitive damages on all claims allowed by law and in an amount to be determined at trial;

D.    Against Defendant University of Colorado and Defendant Schwartz, an injunction prohibiting the University from barring pro-Palestine protests in the UMC and on the UMC South Terrace and prohibiting the University from commencing or continuing disciplinary proceedings against students for engaging in protest activity

authorized by C.R.S. § 23-5-144 in support of Palestinian rights;

E.      Against Defendant University of Colorado and Schwartz, requiring the removal of any disciplinary notations from Plaintiffs' University records concerning the protest on October 3, 2024;

F.      Against all Defendants, attorneys' fees and the costs;

G.      Against Defendants Cramer and Nelson, pre-and post-judgment interest at the lawful rate; and

H.      Any other appropriate relief at law and equity that this Court deems just and proper.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE**

DATED this 13th day of January, 2025

*  /s/ Daniel D. Williams*
Daniel D. Williams
Matthew A. Simonsen
Ashlyn L. Hare
**Hutchinson Black and Cook, LLC**
921 Walnut Street, Suite 200
Boulder, CO 80302
Telephone: (303) 442-6514
Facsimile: (303) 442-6493
dan.williams@hbcboulder.com
matt.simonsen@hbcboulder.com
ashlyn.hare@hbcboulder.com

*Attorneys for Plaintiffs*