IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 25-cv-00107-PAB-KAS

MARI ROSENFELD,
MAX ALEXANDER INMAN,

    Plaintiffs,

v.

UNIVERSITY OF COLORADO, through the Regents of the University of Colorado, a body corporate;
JUSTIN SCHWARTZ, Chancellor of the University of Colorado Boulder, in his official capacity;
DEVIN CRAMER, Dean of Students and Associate Vice Chancellor for Student Affairs of the University of Colorado Boulder, in his individual capacity;
HOLLY NELSON, Deputy Dean of Students and Assistant Vice Chancellor of the University of Colorado Boulder, in her individual capacity,

    Defendants.

**PLAINTIFFS' RESPONSE TO MOTION TO DISMISS FIRST AMENDED COMPLAINT UNDER FED. R. CIV. P. 12(b)(1) AND 12(b)(6)**

Plaintiffs Mari Rosenfeld and Max Alexander Inman, by and through undersigned counsel, respond as follows to Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint Under Fed. R. Civ. P. 12(b)(1) and 12(b)(6), filed May 6, 2025 [Doc. 33] ("Motion").

## INTRODUCTION

Plaintiffs, two students at Defendant University of Colorado ("University"), engaged in a peaceful anti-war protest during an on-campus military and engineering career fair, speaking out against the needless suffering of countless innocent Palestinians in Gaza. [Doc. 22 ¶¶ 3, 29-30, 59-60, 63, 84-86, 97-113.] The next day, Defendants banned Plaintiffs from "the entire campus . . . and any University activities" indefinitely, with a limited exception to attend classes and an overt threat of criminal prosecution or expulsion for any violation of the campus ban. [*Id.* ¶¶ 4, 120-22.]

Defendants imposed this ban as an "interim disciplinary measure"—a rare and extreme measure reserved, according to the University's written policy, for students who pose a "continuing threat to persons or property or ongoing threat of disrupting academic progress"—pending Defendants' investigation of pretextual disciplinary charges against Plaintiffs, two model students with no prior disciplinary histories. [*Id.* ¶¶ 4, 120-28, 139.] Defendants did not lift the interim campus ban for almost two months, long after Defendants obtained security footage discrediting the disciplinary charges and not until Defendants knew Plaintiffs retained legal counsel. [*Id.* ¶¶ 4, 146-48.] As of the filing of the First Amended Complaint, the charges were still unresolved. [*Id.* ¶ 149.][1]

Unsupported by any legitimate disciplinary concern, Defendants' interim campus ban was evidently motivated by a desire to muzzle Plaintiffs' pro-Palestine speech. [*Id.* ¶¶ 118-39, 147-49, 158-59]; *see* [*id.* ¶¶ 29-47, 59-117, 141-45]. Defendant Cramer admittedly sought to relocate the protest to a further, less optimal location after he learned "that the goal of the protest was to express opinions against some of the companies at the Career Fair," [*id.* ¶¶ 77-84, 130], and Defendant Nelson emphasized bystanders' and administrators' negative reactions to Plaintiffs' speech in articulating the basis for the ban, [*id.* ¶ 129]. Moreover, Defendants perceived both Plaintiffs to be leaders of the student organization Students for Justice in Palestine ("SJP") and placed SJP in "bad standing" the same day the campus ban was issued, while declining to discipline pro-Israel protestors and groups for violating University rules. [*Id.* ¶¶ 38-41, 44-46, 114-17, 124-26, 138.]

In the First Amended Complaint, Plaintiffs seek damages and injunctive relief for violations of their First Amendment rights (Counts 1 and 2), due process rights (Count 3), C.R.S. § 23-5-144 (Count 4), and breach of contract (Count 5). Defendants seek to dismiss the First

---

[1] Shortly after Defendants filed the instant Motion to Dismiss, Defendant Holly Nelson issued final disciplinary decisions to both Plaintiffs, in which she largely concedes that the charges were unsupported by a preponderance of the evidence. *See* [Exs. 7-8]; *infra* n.3 & Argument § III.

Amended Complaint in its entirety, asserting that Plaintiffs fail to plausibly allege any constitutional violation, Defendants Cramer and Nelson are entitled to qualified immunity, and the University is immune from the state law claims. Except as to Count 5,[2] each argument fails.

### STANDARDS OF REVIEW[3]

Dismissal under Federal Rule of Civil Procedure 12(b)(6) is allowed only where the complaint fails to state a claim upon which relief can be granted. This Court must accept as true "all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff." *Kerber v. Qwest Group Life Ins. Plan*, 647 F.3d 950, 959 (10th Cir. 2011) (Rule 12(b)(6)); *Groundhog v. Keeler*, 442 F.2d 674, 677 (10th Cir. 1971) (Rule 12(b)(1)). Under the plausibility standard, "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what the claim is and the grounds upon which it rests." *Chavez-Bravo v. Brighton Sch. Dist. 27J*, No. 24-CV-01048-PAB-KAS, 2025 WL 808372, at *3 (D. Colo. Mar. 14, 2025) (Brimmer, C.J.) (alteration in original) (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam)). Accordingly, a complaint is not subject to dismissal under Rule 12(b)(6) if the well-pleaded facts, taken as true, make the plaintiff's claim to relief plausible on its face. *Id.*

---

[2] Because the University asserts Eleventh Amendment immunity to federal litigation of Plaintiffs' breach of contract claim against it, [Doc. 33 at 14], Plaintiffs agree to withdraw Count 5, [Doc. 22 ¶¶ 193-99]. Plaintiffs cannot dismiss this claim by notice or stipulation under Rule 41(a)(1)(A). *E.g.*, *Arroyo v. Marriott Corp.*, No. 19-cv-02483-PAB-NYW, 2020 WL 10320908, at *2 (D. Colo. Jan. 23, 2020), *R. & R. adopted*, 2020 WL 10320904 (Feb. 14, 2020) (Brimmer, C.J.). Even so, dismissal of Count 5 should be without prejudice, as Plaintiffs remain free to reassert this claim in state court. *See, e.g.*, *Doe v. Univ. of Colo.*, 255 F.Supp.3d 1064, 1086-87 (D. Colo. 2017).

[3] In resolving Defendants' Motion, the Court may consider the following materials referenced in the First Amended Complaint: the notices of interim exclusion issued to Plaintiffs on October 4, 2024, [Exs. 1-2], *see* [Doc. 22 ¶¶ 4, 120-33]; security footage of the protest on October 3, 2024, [Exs. 3-6], *see* [Doc. 22 ¶¶ 4, 131-32, 148]; and the final disciplinary decisions issued to Plaintiffs on May 20, 2025, [Exs. 7-8], *cf.* [Doc. 22 ¶¶ 148-49, 162, 192]. Such consideration does not require the Court to treat the Motion as one for summary judgment, as these indisputably authentic materials are referenced in and central to the allegations in the First Amended Complaint. *See, e.g.*, *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010).

"Asserting a qualified immunity defense via a Rule 12(b)(6) motion . . . subjects the defendant to a more challenging standard of review than would apply on summary judgment." *Thompson v. Ragland*, 23 F.4th 1252, 1256 (10th Cir. 2022) (ellipsis in original) (citation omitted). "On a motion to dismiss, 'it is the defendant's conduct *as alleged in the complaint* that is scrutinized for [constitutionality].'" *Id.* (alteration in original) (quoting *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996)). The law is clearly established by either "Supreme Court or Tenth Circuit precedents [o]n point" or a "clear weight of authority from other circuit courts." *Id.* at 1255. Additionally, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." *Id.* at 1255-56 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

## ARGUMENT

**I.     The Motion does not comply with Rule 12's requirement to accept the well-pleaded allegations as true.**

Defendants impermissibly stray from the factual allegations in the First Amended Complaint and draw factual inferences in their own favor. In particular, the Motion asserts that

- the interim campus exclusion did not interfere with Plaintiffs' speech, [Doc. 33 at 6-8]; *contra* [Doc. 22 ¶¶ 30, 51, 121-22, 133-40, 146, 151];

- "nothing in the interim campus exclusion notices referred to . . . speech," [Doc. 33 at 10]; *contra* [Doc. 22 ¶¶ 129-30]; [Exs. 1-2];

- Plaintiffs "disrupted the career fair and interfered with the student attendees' ability to interact with the potential employers," [Doc. 33 at 10]; *accord* [*id.* at 2, 6, 8]; *contra* [Doc. 22 ¶¶ 101-04, 111-12, 128, 131, 139]; [Ex. 3 at 0:00-2:02] (ballroom); [Ex. 4 at 4:20-7:25] (entrance); [Ex. 5 at 4:10-7:25] (same); [Ex. 6 at 0:25-5:00] (south terrace);

- Plaintiffs "violated University policies," [Doc. 33 at 2, 10]; *contra* [Doc. 22 ¶¶ 33-36, 42-46, 95, 128-31, 137-39, 141-45, 149]; and

- the campus ban "was imposed due to the 'serious nature' of the disruption at the career fair, and not because of [Plaintiffs'] protest in general," [Doc. 33 at 6]; *contra* [Doc. 22 ¶¶ 118-39, 147-49, 158-59].

The Motion also implies that Plaintiff Inman was a "former" student, [Doc. 33 at 2]; *but see* [Doc. 22 ¶¶ 3, 7], and that Plaintiffs' protest was redirected to the South Lawn due to a growing "number of protestors at the entrance" to the UMC, [Doc. 33 at 2]; *but see* [Doc. 22 ¶¶ 66-73, 77-84, 130]; [Ex. 6] (view of south terrace). All of those assertions are contrary to what is pleaded. And the Motion adds several disputed factual allegations found nowhere in the First Amended Complaint, including that Plaintiffs acted "directly contrary to . . . instructions" and that the career fair was not "a publicly accessible or open event . . . and not all students could attend." [Doc. 33 at 9]; *see* [Doc. 22]. This is improper. *See, e.g.*, *Brown v. City of Tulsa*, 121 F.4th 1251, 1270-71 (10th Cir. 2025) (reversing dismissal of First Amendment retaliation claim, reasoning "no plaintiff is required to controvert facts offered by any defendant in the first instance at the 12(b)(6) stage" and "the district court construed [plaintiff]'s allegations *against him*, rather than in his favor").

    **II.**    **Defendants are not entitled to dismissal at the pleading stage.**

        **A. Plaintiffs plausibly allege that Defendants retaliated against them in violation of their clearly established First Amendment rights (Count 1).**

In their Motion, Defendants do not contest the first and third elements of Plaintiffs' First Amendment retaliation claim:

(1) Plaintiffs engaged in constitutionally protected activity,
(2) **[DISPUTED]** Defendants' actions caused Plaintiffs to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and
(3) Defendants' adverse action was substantially motivated as a response to Plaintiffs' exercise of constitutionally protected conduct.

5

[Doc. 33 at 5] (quoting *Jemaneh v. Univ. of Wyo.*, 82 F.Supp.3d 1281, 1293 (D. Colo.), *aff'd*, 622 F.App'x 765 (10th Cir. 2015)). Defendants contend only that Plaintiffs fail to plausibly allege any adverse action satisfying the second element or at least fail to do so under clearly established law.

Neither the Supreme Court nor Tenth Circuit seems to have addressed First Amendment retaliation arising from an indefinite interim campus ban exactly like the one here, which ultimately lasted for 53 days. But the Tenth Circuit has long recognized the chilling effect of *even less severe* sanctions in the public education context, including excluding a student from an extracurricular activity, *see Seamons v. Snow*, 84 F.3d 1226, 1238 (10th Cir. 1996) (holding student "state[d] a claim that Defendants violated clearly established law when [student] was dismissed from the football team because of his speech"), and prohibiting contact with one of plaintiff's former professors and that professor's students, *see Thompson*, 23 F.4th at 1255, 1259. In fact, even the issuance of a "reprimand or censure [to] students . . . may in some circumstances materially impair First Amendment freedoms." *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 480 (2022) (citing, *inter alia*, *Holloman v. Harland*, 370 F.3d 1252, 1268-69 (11th Cir. 2004)); *cf. id.* at 482 ("Our case is a narrow one. . . . It does not involve expulsion, *exclusion*, or any other form of punishment.") (emphasis added).

Here, one day after Plaintiffs' participation in the SJP protest, Defendants *indefinitely* banned Plaintiffs from "the entire campus . . . and any University activities," pursued baseless criminal charges,[4] and placed SJP, an organization purportedly led by both Plaintiffs, in bad standing. [Doc. 22 ¶¶ 3-4, 114-22, 138, 141-45.] For nearly two months, as a result of the campus ban, Plaintiffs were unable to return to campus or any University activities except to attend classes.

---

[4] While Defendant Cramer's filing of a groundless police report is not itself an objectively chilling action, when viewed alongside the simultaneous campus ban and suspension of SJP, it only adds to the fear perceived by an objectively reasonable student in Plaintiffs' position—that continuing to engage in pro-Palestine, pro-peace protest would result in severe consequences.

[*Id.* ¶¶ 30, 51, 121-22, 133-40, 146, 151.] Among other things, this prevented Plaintiffs from participating in additional SJP protests, working their respective jobs on campus, and accessing the multitude of University facilities and activities for which Plaintiffs were still charged student fees. [*Id.*] Defendants explicitly threatened that any violation would result in severe consequences—that Plaintiffs' "unauthorized presence on campus *will* be considered trespassing and *will* result in the notification of law enforcement," and that "[a]ny further violations" or "non-compliance with these interim measures . . . may jeopardize [Plaintiffs'] status as a student." [*Id.* ¶ 122] (emphasis added and omitted); *cf. Irizarry v. Yehia*, 38 F.4th 1282, 1292 (10th Cir. 2022) ("[V]erbal intimidation can chill speech."). And to the public, the campus bans of Plaintiffs were deemed severe enough to be newsworthy, drawing media coverage and criticism from multiple University professors. *See* [Doc. 22 ¶ 127].

All told, these facts plausibly support that Defendants' actions would chill a person of ordinary firmness from continuing to protest on campus, just as is alleged in the First Amended Complaint. [*Id.* ¶¶ 158-59]; *cf. McCook v. Spriner Sch. Dist.*, 44 F.App'x 896, 905 (10th Cir. 2002) (concluding parents of expelled student who were summarily banned from campus "could prevail" on second element of First Amendment retaliation claim); *Irizarry*, 38 F.4th at 1292-93 (holding that standing "in front of [journalist's] camera and shin[ing] a flashlight into it" at a potentially critical moment "alone would chill a person of ordinary firmness from continuing to film").

Moreover, Defendants Cramer and Nelson are not entitled to qualified immunity. The right to engage in peaceful anti-war protest on a college campus is not just clearly established; it is a hallmark of First Amendment jurisprudence. *See, e.g.*, *Hess v. Indiana*, 414 U.S. 105, 107-08 (1973); *Healy v. James*, 408 U.S. 169, 194 (1972); *Bowman v. White*, 444 F.3d 967, 979 (8th Cir. 2006). It is equally well settled that public university officials are prohibited from retaliating against students as a result of their protected speech. *E.g.*, *Thompson*, 23 F.4th at 1260 ("To be

7

sure, we cannot point to a precedent with identical facts. But the law was clear that discipline cannot be imposed on student speech without good reason.").

It is inapposite whether pre-existing caselaw expressly forbids Defendants' chosen means of retaliating against Plaintiffs here. *Cf.* [Doc. 33 at 8]. The Tenth Circuit has long recognized that "[t]he unlawful intent inherent in such a retaliatory action places it beyond the scope of [an official's] qualified immunity if the *right* retaliated against was clearly established." *Worrell v. Henry*, 219 F.3d 1197, 1215-16 (10th Cir. 2000) (alterations in original) (emphasis added) (quoting *DeLoach v. Bevers*, 922 F.2d 618, 620 (10th Cir. 1990)); *accord Thompson*, 28 F.4th at 1259-60. Indeed, multiple courts in this Circuit have denied qualified immunity when similarly confronted with retaliatory campus bans. *See, e.g.*, *Flores v. Victory Preparatory Acad.*, 411 F.Supp.3d 1149, 1161 (D. Colo. 2019); *Douglass v. Garden City Cmty. Coll.*, 543 F.Supp.3d 1043, 1055-56 (D. Kan. 2021); *see also Thompson*, 28 F.4th at 1253, 1255 (10th Cir.) (reversing grant of qualified immunity to "MSU's Associate Director for Student Conduct" for retaliatory "No Contact order" of unspecified duration issued in response to plaintiff's protected speech). If anything, Defendants' effort to select a punishment not precisely addressed by the Supreme Court or Tenth Circuit's retaliation precedents further evinces that Defendants acted with the very motive that the Constitution clearly forbids.[5]

---

[5] Troublingly, this tactic may not be unique to Defendants, as numerous universities throughout the country are currently accused of summarily deploying indefinite campus bans to silence pro-Palestine speech on campus. *E.g.*, Verified Compl., ¶ 4, *Zou v. Ono*, No. 2:25-cv-10315-MAG-APP, ECF No. 1 (E.D. Mich. filed Feb. 3, 2025) ("This lawsuit focuses on the fact that each [Plaintiff] has been banned from the entire University of Michigan Ann Arbor campus . . . after having participated in a recent pro-Palestine protest on campus."); Am. Compl., ¶¶ 1, 4, *Dames v. Roberts*, No. 1:25-cv-00191, ECF No. 10 (M.D.N.C. filed Apr. 18, 2025) (alleging UNC Chapel Hill officials "summarily suspended and banned students . . . from campus without a hearing" and "summarily issued immediate indefinite campus bans to non-students" after they "gathered on the University's campus, a central hub for protest and activism, to express solidarity with the nationwide movement across university campus for Palestinian lives and liberation"); Compl., ¶¶ 1-3, *Wirtshafter v. Whitten*, No. 1:24-cv-00754-RLY-MJD, ECF No. 1 (S.D. Ind. filed May 3,

The cases cited by Defendants do not compel a contrary conclusion. Unlike here, *Yeasin v. Durham* concerned "unsettled" First Amendment doctrine "[a]t the intersection of university speech and social media," 719 F. App'x 844, 852 (10th Cir. 2018) (unpublished), and specifically involved discipline for persistent online speech that "likely constituted harassment," *Thompson*, 23 F.4th at 1261 (distinguishing *Yeasin*). In both *Pierce v. Chene* and *Smith v. Plati*, the nonstudent plaintiffs admittedly kept engaging in much of the supposedly chilled protected activity after the challenged bans were imposed. *Pierce*, No. 1:15-CV-758, 2017 WL 3600458, at *9 (D.N.M. Feb. 1, 2017) ("There are no allegations . . . the ban interfered with the Pierces' ability to communicate with the governing board, the school board, or PED. The Pierces attended and spoke at two governing council meetings, filed formal complaints with the APS school board and PED, attended an APS school board meeting and spoke publicly about their experience at AKCS, and met with APS officials to discuss the situation well after the ban took effect."); *Smith*, 258 F.3d 1167, 1176-77 (10th Cir. 2001) (noting pro se plaintiff's "factual allegations were . . . sparse" and his "persistence in maintaining his website offers some evidence that [defendant]'s actions did not prevent such private speech"); *cf.* [Doc. 22 ¶ 137]. And any employment retaliation cases are largely irrelevant: as an employer, the government may impose "restrictions on speech that would not be justified in other contexts." *Worrell*, 219 F.3d at 1210; *see also Baca v. Sklar*, 398 F.3d 1210, 1220 (10th Cir. 2005) ("[A] public employer can violate an employee's First Amendment rights by subjecting an employee to repercussions that would not be actionable under Title VII.").

Accordingly, Defendants are not entitled to dismissal of Count 1.

---

2024) (alleging "students and faculty at [University of Indiana] were given 'no-trespass orders'" after engaging in on-campus "demonstrations over the war that is currently raging in Gaza").

### B. Plaintiffs plausibly allege a direct violation of their clearly established First Amendment rights (Count 2).

Defendants contend that "the FAC lacks plausible allegations that the University's actions were based on the speech's content," [Doc. 33 at 9], and that "an interim campus exclusion is [not] a 'chilling' action," [*id.* at 11].[6] The Motion does not articulate, let alone challenge, the remaining elements of Count 2:

(1) Plaintiffs intended to engage in protected activity on a matter of public concern,
(2) Plaintiffs did so in a traditional or designated public forum,[7]
(3) **[DISPUTED]** Defendants suppressed Plaintiffs' speech,
(4) **[DISPUTED]** Defendants targeted and intended to suppress Plaintiffs' speech based on its content, and
(5) Defendants' suppression of Plaintiffs' speech was overbroad, unreasonable, and not narrowly tailored to serve a significant government interest.

*See Summum v. City of Ogden*, 297 F.3d 995, 1001-03 (10th Cir. 2002); [Doc. 33 at 9-11].

Throughout the Motion, Defendants dispute that Plaintiffs' speech was chilled or suppressed by the interim campus ban. This factual argument not only fails to accept Plaintiffs' well-pleaded allegations as true, *see* [Doc. 22 ¶¶ 30, 51, 121-22, 133-40, 146, 151]; *supra* Argument § 1, but also ignores that the interim campus ban excluded Plaintiffs from the UMC and every other public forum on campus, *compare* [Doc. 22 ¶ 121] (exclusion from "the entire campus"

---

[6] Insofar that the latter argument is couched in terms of qualified immunity and expressly incorporates that argument with respect to Count 1, it fails for the same reasons addressed above.

[7] To the extent Defendants imply that Plaintiffs' speech did not occur in a traditional or designated public forum, *see* [Doc. 33 at 9-10], this argument merely discredits Plaintiffs' factual allegations that are entitled to a presumption of truth, *see, e.g.*, [Doc. 22 ¶¶ 48-59, 95]; *supra* Argument § 1. For more than fifty years, "the University Memorial Center, located on the Boulder campus," has served as "a focal point for the discussion of public questions" and "opened its doors to the public." *Watson v. Bd. of Regents*, 512 P.2d 1162, 1164-65 (Colo. 1973) (holding nonstudent plaintiff was entitled to procedural due process before being excluded from "all University property including . . . the Boulder campus," where plaintiff "went to the [UMC] . . . for the purposes of continuing certain tasks in which he was engaged with the Black Student Alliance, a University-recognized student association," and "was cited for trespass"); *accord* [Doc. 22 ¶¶ 48-58]. Accordingly, based on the facts in the FAC and Colorado law, Plaintiffs plausibly allege that their protest took place in a traditional or designated public forum. *See* [*id.*]; C.R.S. § 23-5-144(2)(d), (4).

10

except to "attend classes"), *with* C.R.S. § 23-5-144(2)(d) ("any generally accessible, open, outdoor area on the campus of an institution of higher education, as well as any nonacademic and publicly open portion of a facility . . . traditionally made available to students for expressive purposes"). Accordingly, the campus bans' purported regulation of only "physical access to locations," [Doc. 33 at 10], is not dispositive. *See, e.g.*, *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 76 (2022) ("[T]hat the [restriction] is facially content neutral does not end the First Amendment inquiry. If there is evidence that an impermissible purpose or justification underpins a facially content-neutral restriction, for instance, that restriction may be content based.").

Defendants' argument that the interim ban was prompted by Plaintiffs' actions, not Plaintiffs' speech, is similarly flawed. Although Defendants urge the Court to disregard, as conclusory, Plaintiffs' allegations that the campus ban was intended "to prevent, or at least discourage, further disfavored speech by Plaintiffs" and "was not imposed to serve any legitimate disciplinary purpose," [Doc. 33 at 10] (quoting [Doc. 22 ¶¶ 138-39]), this Court has recognized that "[t]he 'plausibility' standard requires that relief must plausibly follow from the facts alleged, not that the facts themselves be plausible." *Chavez-Bravo*, 2025 WL 808372, at *3 (citation omitted). Regardless, Defendants ignore many other facts supporting these allegations, including:

- at Cramer's behest, the SJP demonstrators were instructed to leave an unreserved portion of the South Terrace to move to the South Lawn, further from their intended audience, once Cramer learned "that the goal of the protest was to express opinions against some of the companies at the Career Fair," [Doc. 22 ¶¶ 77-84, 130];
- Nelson's notices to both Plaintiffs did not "assert, let alone explain, that Plaintiffs posed any continuing threat to persons or property or ongoing threat of disrupting academic progress," but instead "emphasized various bystanders' negative reactions to Plaintiffs'

11

protest, as well as administrators' fear 'that several employers . . . may pull out of future career fairs,'" [*id.* ¶¶ 128-29];

- the notices relied heavily on Cramer's report of the incident, which included many observations that were "unequivocally refuted" by security footage, [*id.* ¶¶ 130-32]; *compare* [Exs. 1-2], *with* [Exs. 3-6];

- the notices identified Plaintiffs as "leadership of SJP," which was simultaneously placed in bad standing by the University, [*id.* ¶¶ 114-17, 138];

- the campus ban remained in effect even after Nelson reviewed the exculpatory security footage and was never clarified despite Plaintiffs' requests, [*id.* ¶¶ 133-35, 148];

- the ban was lifted "nearly two months after [it] was imposed" and not until "Nelson was aware that Plaintiffs had retained legal counsel," [*id.* ¶¶ 146-47];

- pro-Israel student groups and counter-protestors received more favorable treatment, including at least one counter-protestor who simultaneously entered the career fair while filming Plaintiffs and other SJP members, *see* [*id.* ¶¶ 36-47, 92-93, 126]; and

- it was unprecedented for Defendants to impose an interim exclusion where, as here, Plaintiffs were merely accused of nonviolent first-time student conduct violations, [*id.* ¶¶ 4, 124-27].

For these reasons, Defendants are not entitled to dismissal of Count 2.

### C. Plaintiffs allege a plausible violation of their clearly established rights to due process.

The Motion challenges only the first element of Plaintiffs' due process claim, on both plausibility and qualified immunity grounds:

(1) **[DISPUTED]** a constitutionally cognizable liberty or property interest,
(2) a deprivation of this interest, and
(3) a lack of constitutionally adequate notice and a hearing.

12

*Martin Marietta Materials, Inc. v. Kansas Dep't of Transp.*, 810 F.3d 1161, 1172 (10th Cir. 2016); *see* [Doc. 33 at 11]. Defendants contend only that the interim campus bans did not implicate any clearly established right to due process, not that any process afforded to Plaintiffs was constitutionally appropriate. *See* [Doc. 33 at 11-13]; *cf.* [Doc. 22 ¶ 123].

Contrary to Defendant's assertion, "[i]t is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech." *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 460 (1958).

Further, as students enrolled at a public university, Plaintiffs had a well settled property interest in their right to continued education and access to the facilities for which they paid. *Goss v. Lopez*, 419 U.S. 565, 574-76 (1975); *Caldwell v. Univ. of N.M. Bd. of Regents*, 679 F.Supp.3d 1087, 1152 (D.N.M. 2023) (collecting Tenth Circuit cases); *cf. Watson v. Bd. of Regents*, 512 P.2d 1162, 1164-65 (Colo. 1973). To the extent Defendants argue otherwise, none of the cases they cite address the rights of students actively enrolled at the time of the challenged deprivation. *See Souders v. Lucero*, 196 F.3d 1040, 1043 (9th Cir. 1999) (alumnus accused of stalking two students); *Duckett v. Okla. ex rel. Bd. of Regents of Univ. of Okla.*, 986 F. Supp. 2d 1249, 1257 (W.D. Okla. 2013) (employee "removed from his teaching duties and required to obtain admission to the University's campus through [the provost]"); *Profita v. Puckett*, No. 1:15-cv-01237-DME-CBS, 2017 WL 4225451, at *4 (D. Colo. June 6, 2017) (former student, who unsuccessfully challenged expulsion in state court, warned not to return to campus). The Supreme Court has made clear that the rights of "students and nonstudents" to access campus are not necessarily "alike." *Widmar v. Vincent*, 454 U.S. 263, 267 n.5 (1981) ("[T]he campus of a public university, *at least for its students*, possesses many of the characteristics of a public forum.") (emphasis added).

Indeed, the University's official policy setting the threshold for imposing an interim exclusion—which was ignored by Defendants here—is apparently based on the Court's decision in *Goss*:

> [T]here are recurring situations in which prior notice and hearing cannot be insisted upon. Students whose presence poses *a continuing danger to persons or property or an ongoing threat of disrupting the academic process* may be immediately removed from school. In such cases, the necessary notice and rudimentary hearing should follow as soon as practicable . . . .

419 U.S. at 582-83 (emphasis added); *see* [Doc. 22 ¶¶ 128, 139]; Univ. of Colo., 2024-2025 Student Code of Conduct § L, at p. 21, https://www.colorado.edu/sccr/media/230.

Moreover, less severe deprivations of access to campus, even for nonstudents, have been held to trigger procedural due process requirements. *See, e.g.*, *Flores*, 411 F.Supp.3d at 1162 (indefinite ban of parents); *Caldwell*, 679 F.Supp.3d at 1170-71 (indefinite ban ended after 29 days) *Goss*, 419 U.S. at 576 (10-day suspension); *cf. Couture v. Bd. of Educ.*, 535 F.3d 1243 (10th Cir. 2008) ("At some point, punishment timeouts used excessively might become the functional equivalent of the out-of-school suspension at issue in *Goss*."). And at least one court in this Circuit has specifically addressed the significance of any distinction between a suspension and an indefinite campus ban in the context of a procedural due process claim, concluding that "a campus ban interferes with a student's right to continued education" such that constitutional requirements of procedural due process apply. *Caldwell*, 679 F.Supp.3d at 1155; *see id.* at 1171 ("Because the campus ban is more than de minimis, Caldwell is entitled to some degree of due process.").

Thus, Defendants are not entitled to dismissal of Count 3.

### D. C.R.S. § 23-5-144 authorizes Plaintiffs to sue the University in any court of competent jurisdiction (Count 4).

In their Motion, Defendants do not challenge the plausibility of Count 4. Rather, they contend only that Eleventh Amendment immunity bars litigation of this claim in federal court and, if the federal claims are dismissed, this Court should decline to exercise supplemental jurisdiction.

14

Count 4 is a statutory cause of action for "students enrolled at public institutions of higher education" to vindicate certain free speech rights under both the "first amendment of the United States constitution and article II, section 10 of the Colorado constitution." C.R.S. § 23-5-144(1)(a). The statute not only expressly incorporates federal law, C.R.S. § 23-5-144(1)(a), (3)(c), but also authorizes an aggrieved student to bring an action for injunctive relief against "a public postsecondary institution" in any "court of competent jurisdiction." C.R.S. § 23-5-144(2)(b), (6); *cf. Griess v. State of Colo.*, 841 F.2d 1042, 1044 (10th Cir. 1988) (holding Colorado Governmental Immunity Act did not waive Eleventh Amendment immunity and highlighting provision addressing applicability of CGIA to federal law claims brought "in any court of this state"). Accordingly, the University's Eleventh Amendment immunity has been waived as to Count 4.

### III.   Any dismissal should be without prejudice.

On May 20, 2025, two weeks after Defendants filed this Motion, Defendant Nelson issued final decisions to both Plaintiffs on the disciplinary charges initiated on October 4, 2024. Without going so far as admitting that every charge was unfounded, Defendant Nelson notably found that Plaintiffs did *not* materially and substantially disrupt the career fair, *see* [Ex. 7 at 8]; [Ex. 8 at 8]—further confirming that "the interim exclusion was not imposed to serve any legitimate disciplinary objective contemplated by Section L(2) of the Student Code of Conduct," [Doc. 22 ¶ 139]. And as to Plaintiff Rosenfeld, the final decision concedes that she violated no University policies beyond (1) failing "to register for the Career Fair either ahead of time . . . or at the time of arrival" and (2) using "the megaphone on the south lawn to ask people to disperse," in "a space other than the UMC['s]" designated free speech zone. [Ex. 7 at 9-10]; *but see* C.R.S. § 23-5-144(5). Accordingly, insofar that the Court is persuaded by Defendants' arguments, any dismissal should be without prejudice so that Plaintiffs may seek leave to amend at that time.

15

**CONCLUSION**

Count 5 should be dismissed without prejudice. Otherwise, for the foregoing reasons, the Motion should be denied.

Respectfully submitted this 10th day of June, 2025.

                GRATA LAW AND POLICY LLC

                */s/ Matthew A. Simonsen*
                Daniel D. Williams
                Matthew A. Simonsen
                1919 14th Street, Suite 700
                Boulder, CO 80302
                Telephone: 303-535-3533
                dan@gratalegal.com
                matt@gratalegal.com

                *Counsel for Plaintiffs*