IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 25-cv-00107-PAB-KAS

MARI ROSENFELD, and
MAX ALEXANDER INMAN,

Plaintiffs,

v.

UNIVERSITY OF COLORADO, through the Regents of the University of Colorado, a
body corporate, et al.,

Defendants.

---

**ORDER**

---

This matter comes before the Court on Defendants' Motion to Dismiss Plaintiffs'

First Amended Complaint Under F.R.C.P. 12(b)(1) and 12(b)(6) [Docket No. 33].

Plaintiffs Mari Rosenfeld and Max Alexander Inman filed a response.  Docket No. 52.

Defendants University of Colorado ("the University"), Justin Schwartz, Devin Cramer,

and Holly Nelson filed a reply.  Docket No. 55.  The Court has jurisdiction under 28

U.S.C. § 1331.

I.    **FACTS[1]**

At the time of the events alleged in the complaint, Ms. Rosenfeld was enrolled as

an undergraduate student at the University and worked as an on-campus employee.

Docket No. 22 at 2-3, ¶ 6.  Mr. Inman was undergraduate student at the University who

---

[1] The facts below are taken from plaintiffs' complaint, Docket No. 22, and are
presumed to be true, unless otherwise noted, for purpose of ruling on the motion to
dismiss.

graduated in December 2024 with a bachelor's degree. *Id.* at 3, ¶ 7.  On October 3, 2024, plaintiffs participated in a student protest at a University job fair, organized by the student group Students for Justice in Palestine ("SJP"). *Id.* at 2, ¶ 3.  SJP is "national organization that supports over 350 assembled groups on college and university campuses across North America." *Id.* at 7, ¶ 29.  SJP was "formed specifically to fight for Palestinian liberation through political and educational actions" and protests "the United States' funding and other support for Israel's ongoing assault on Gaza." *Id.*, ¶ 30.  The University of Colorado chapter of SJP was organized as a student group in the summer of 2023. *Id.*, ¶ 31.  SJP registered as an official student-led group at the University of Colorado in or around September 2023. *Id.*  Registered student organizations receive "a variety of benefits, such as funding for events, attendance at the University student organization fair, promotional benefits, and the ability to host registered events, with additional rights such as using amplified sound or music." *Id.*, ¶ 32.

On or about August 28, 2024, SJP members met with Mr. Schwartz, Chancellor of the University of Colorado and D'Andra Mull, Vice Chancellor of Student Affairs, to discuss the University's policies on speech and protests, including the Campus Use of University Facilities ("CUUF") procedures. *Id.* at 3, 8, ¶¶ 9, 34.  Although the meeting was initially scheduled for one hour, the meeting was cut short at 30 minutes by the administration, "leaving SJP members with additional questions concerning relevant policies." *Id.* at 8, ¶ 35.  SJP has been "subject to extreme monitoring by the administration and abundant security presence at its planned events in an effort to minimize the reach of SJP's protest activities." *Id.*, ¶ 36.  The University "does not

monitor and deploy law enforcement to all events hosted by other students organizations," such as Students Supporting Israel ("SSI"), which is "in many ways a counterpart to SJP, as it engaged in analogous protest activities and advocacy related to the war in Gaza."  *Id.* at 8-9, ¶¶ 39-40.

SJP's protest on October 3, 2024 took place outside of and inside the University Memorial Center ("UMC"), located on the University campus.  *Id.* at 9-10, ¶ 48.  The UMC was "specifically designated to be a place of collaboration for University of Colorado students."  *Id.* at 10, ¶ 49.  The UMC is "almost exclusively devoted to nonacademic student activities, organizations, and services."  *Id.*, ¶ 51.  The UMC is generally open to the public, including nonstudents.  *Id.*, ¶ 52.  Student organizations often advertise their organizations and hold events at the UMC.  *Id.*, ¶ 54.  The UMC has "long been used as a forum for public protest and debate."  *Id.*, ¶ 55.

On October 3, 2024, the University sponsored a science, technology, and engineering job fair that took place in the Glenn Miller Ballroom, which is located inside of the UMC.  *Id.* at 11, ¶ 59.  The job fair was planned to start at 10:00 a.m. and end at 4:00 p.m.  *Id.* at 12, ¶ 67.  The job fair included companies that have "contributed to the productions of weapons used by the IDF against Palestinians in Gaza."  *Id.* at 11, ¶ 60. SJP planned to protest at the job fair to "publicly object to the United States' support of Israel's campaign and to educate students who may have been unaware of the companies' links to the destruction of Gaza."  *Id.*, ¶ 63.  SJP advertised the protest.  *Id.*, ¶ 64.  Upon learning of the protest, Mr. Cramer, the Dean of Students and Associate Vice Chancellor for Student Affairs at the University, arranged for law enforcement to cover the event.  *Id.* at 3, 11, ¶¶ 10, 65.

3

At approximately 11:00 a.m. on October 3, 2024, SJP members, including Ms. Rosenfeld, gathered near the main entrance of the UMC to prepare for the protest. *Id.* at 12, 13, ¶¶ 66, 71. In preparation for the job fair, the University erected a large tent enclosure on the South Terrace of the UMC, located near the main entrance. *Id.* at 12, ¶ 68. The University also erected a barrier that separated the South Terrace from the walkway in front of the UMC. *Id.* The layout of the area near the UMC's main entrance is depicted below:



*Id.*, ¶ 66. The tent on the South Terrace was "available for use by recruiters attending the job fair, but the formal event for students was being held indoors in the Glen Miller Ballroom inside the UMC." *Id.*, ¶ 69. The SJP members stayed near the main entrance of the UMC in a manner that did not impede access to the UMC or to the tent. *Id.* at 12-

13, ¶ 70.  There was sufficient space for students to protest without blocking the door to enter and exit the UMC or blocking access to the tent.  *Id.* at 13, ¶¶ 72-73.

Ms. Rosenfeld was chosen as SJP's acting "marshal" during the protest and was wearing a yellow vest in fulfilling that role.  *Id.*, ¶ 74.  SJP marshal duties included "directing students arriving to join the protest, coordinating with any University officials and/or law enforcement, and otherwise ensuring that the protest runs smoothly."  *Id.*, ¶ 75.  While Ms. Rosenfeld met students participating in the protest near the main entrance, Mr. Inman "walked the perimeter of the area and gathered straggler students who were attempting to find the location for the protest."  *Id.*, ¶ 76.

At approximately 11:30 a.m., at the direction of Mr. Cramer, the University's Student Engagement Response Team ("SERT") explained to the protesters that the South Terrace was reserved and directed the students to move to the South Lawn to protest.  *Id.*, ¶ 77.  SERT informed the protesters that they were allowed to use the South Lawn from 12:00 p.m. to 1:00 p.m. for their protest.  *Id.*, ¶ 79.  SJP members complied and moved to the South Lawn.  *Id.*, ¶ 80.  Two counter-protesters arrived and moved to the South Lawn.  *Id.* at 14, ¶ 81.  From the South Lawn, protesting students were not visible to recruiters and students entering the job fair, as they would have been from the main entrance.  *Id.*, ¶ 84.

SJP displayed a large banner that identified SJP and stated, "Free Palestine, End the Occupation," along with additional, smaller signs.  *Id.*, ¶ 85.  At approximately 11:30 a.m., SJP began to chant statements such as, "No more money for Israel's crimes" and "[t]he occupation has got to go."  *Id.*, ¶ 86.  At approximately 11:45 a.m., Mr. Inman rejoined the group of protesters.  *Id.*, ¶ 87.  At approximately 12:00 p.m.,

protesting students began to use a bullhorn to amplify their chants as allowed by CUUF procedures and as explained to SJP.  *Id.*, ¶¶ 88-89.  Mr. Inman used the bullhorn and stated that he was "going into the career fair if you want to join me."  *Id.*, ¶ 91.

Ten students followed Mr. Inman and Ms. Rosenfeld towards the UMC, with Mr. Inman walking in front with the bullhorn.  *Id.* at 14-15, ¶ 92.  At least one of the counter-protesters followed the group while filming.  *Id.* at 15, ¶ 93.   SJP entered the UMC through the main entrance and turned right down a hallway leading to Glenn Miller Ballroom.  *Id.*, ¶ 94.  A woman, who appeared to be assisting with the job fair, attempted to stop SJP's procession and prevent the group from entering Glenn Miller Ballroom.  *Id.* at 14-15, ¶ 96.  Other administrators also attempted to stop the students from entering Glenn Miller Ballroom.  *Id.*  Without touching the administrators, the students walked approximately ten feet into Glenn Miller Ballroom.  *Id.* at 16, ¶¶ 97, 98.

In Glenn Miller Ballroom, there were approximately three hundred people, mostly consisting of students meeting with recruiters.  *Id.*, ¶ 99.  Mr. Inman, through the bullhorn, stated that "there are corporations profiting from the genocide in Palestine here today."  *Id.*, ¶ 100.  The students in Glenn Miller Ballroom continued meeting with recruiters, notwithstanding Mr. Inman's statement.  *Id.*, ¶ 101.  Glenn Miller Ballroom was loud because students were busy speaking with recruiters.  *Id.*, ¶ 102.  Only students and recruiters within an approximately 25-foot radius could hear what Mr. Inman was saying and only the people "very close to the Ballroom Entrance, within an approximately 10-foot radius, appeared to pay any attention at all to the announcement."  *Id.* at 17, ¶¶ 103-104.  A nearby person in the crowd responded to Mr. Inman's announcement, stating that they were in a "professional space" and indicated

6

that SJP should leave.  *Id.*, ¶ 105.  Mr. Inman responded that it was "not very professional to kill children."  *Id.*, ¶ 106.

An administrator and law enforcement officer approached the group and requested that they leave the building.  *Id.*, ¶ 107.  Ms. Rosenfeld spoke to the administrator and law enforcement officer to confirm whether the request was an official order.  *Id.*, ¶ 108.  The law enforcement officer told Ms. Rosenfeld that he was giving SJP students a lawful order to leave Glenn Miller Ballroom.  *Id.*, ¶ 109.  Ms. Rosenfeld informed Mr. Inman of the law enforcement officer's statement, and Mr. Inman concluded his statement and left the building.  *Id.*, ¶ 110.  Less than one minute elapsed between the law enforcement officer ordering SJP to leave the building and plaintiffs' compliance with that order.  *Id.*, ¶ 111.  Less than four minutes elapsed between plaintiffs entering the UMC and exiting to return to the South Lawn.  *Id.*, ¶ 112.  Once SJP returned to the South Lawn, the group continued to hold signs and chant for approximately ten minutes before concluding the protest.  *Id.*, ¶ 113.  All the while, SJP was being followed by "pro-Israel counter-protesters."  *Id.*

On October 4, 2024, the day following the protest, University administrators placed SJP in bad standing.  *Id.* at 18, ¶ 114.  University administrators cited alleged violations of CUUF procedures, including disruption of the job fair and use of amplified sound, as the reason for placing SJP in bad standing.  *Id.*, ¶ 115.  The bad standing designation effectively barred SJP from operating as a recognized student organization. *Id.*, ¶ 116.  On October 4, 2024, Holly Nelson, Deputy Dean of Students and Assistant Vice Chancellor for Student Affairs, initiated Student Code of Conduct proceedings against plaintiffs.  *Id.* at 3, 18, ¶¶ 11, 118.  Mr. Cramer directed Ms. Nelson to initiate the

7

proceedings.  *Id.* at 18, ¶ 119.  Ms. Nelson issued written notices[2] to each plaintiff of the

Student Code of Conduct charges, including alleged "Interference, Obstruction, or

Disruption of CU Boulder Activity," "Unauthorized Access," "Fire Safety – Blocking or

Barring an[ ] Exit," and "Violation of [CUUF Procedures]."  *Id.*, ¶ 120.  The notices also

stated the following:

> I am excluding you from the University of Colorado Boulder, effective today,
> October 4, 2024, pursuant to Section L(2) of the Student Code of Conduct.  This
> interim exclusion means that you are now excluded from the entire campus, on-
> campus housing, and any University activities.  During this time, you may attend
> classes and must arrive no earlier than 10 minutes before class and leave no
> later than 10 minutes once the class is concluded.
>
> . . .
>
> Your unauthorized presence on campus will be considered trespassing and will
> result in the notification of law enforcement.  Any further violations of the Student
> Code of Conduct may jeopardize your status as a student.

---

[2] Plaintiffs attach to their response the written notices.  *See* Docket Nos. 52-1–2.
Generally, a court should not consider evidence beyond the pleadings when ruling on a
12(b)(6) motion.  The Tenth Circuit has recognized a "limited exception" to this rule: the
"district court may consider documents referred to in the complaint if the documents are
central to the plaintiff's claim and the parties do not dispute the documents'
authenticity."  *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1282 (10th Cir. 2019);
*see also GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th
Cir. 1997) (recognizing that "if a plaintiff does not incorporate by reference or attach a
document to its complaint, but the document is referred to in the complaint and is
central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to
the court to be considered on a motion to dismiss").  A court has "broad discretion in
determining whether or not to accept materials beyond the pleadings." *Lowe v. Town of
Fairland*, 143 F.3d 1378, 1381 (10th Cir. 199).  The Court finds that the notices are
central to plaintiffs' claims because they imposed the interim measures that plaintiffs are
challenging on First Amendment and due process grounds.  The parties do not dispute
the authenticity of the notices.  Therefore, the Court will exercise its discretion to
consider the notices.  The Court further notes that, "[w]here a complaint references
extrinsic documents which contradict other general allegations in the complaint, a court
is not obliged to accept the contradicted allegations as true." *Openwater Safety IV, LLC
v. Concept Special Risks, Ltd*, No. 18-cv-01400-NYW, 2018 WL 11435659, at *5 (D.
Colo. Dec. 12, 2018) (citation omitted).

> Interim measures remain in effect until you are otherwise notified by Student Conduct and Conflict Resolution.  Any non-compliance with these interim measures or violation of the Student Code of Conduct may jeopardize your status as a student.

*Id.* at 18-19, ¶¶ 121-122.  The notices did not provide an opportunity for a hearing or appeal to challenge the interim exclusions.  *Id.* at 19, ¶ 123.  The interim exclusion of a CU Boulder student is "seldom imposed except where the student is credibly alleged to the be perpetrator of physical or sexual violence, stalking, or repeated materially disruptive behavior."  *Id.*, ¶ 124.  Plaintiffs had no prior disciplinary violations on their respective student records before the October 3, 2024 protest.  *Id.*, ¶ 125.  Plaintiffs are "unaware of any other CU Boulder students that have been excluded from campus on an interim basis pending the investigation of a nonviolent first-time student conduct offense."  *Id.*, ¶ 126.

The notices mentioned bystanders' negative reactions to plaintiffs' protest and administrator's fear that "several employers, including employers that hire a significant number of CU students and partner research grants, may pull out of future career fairs."  *Id.* at 20, ¶ 129.  The notices "heavily cited" Mr. Cramer's report of the incident.  *Id.*, ¶ 130.  Mr. Cramer stated in his report, "we knew, based on the chalking, that the goal of the protests was to express opinions against some of the companies at the Career Fair" and in turn decided, "that in this case, we would ask [SJP] to move from the south terrace to the south lawn . . . ."  *Id.*  Mr. Cramer report contained the following observations:

> a. Defendant Cramer's reported observation that "all interviews and student/employer interactions had ceased, and the attention was solely focused on the protesters,"

b. His observation that "several students . . . appeared to be trying to exit but were unsure of how to do so given the situation,"

c. His observation that "the event was forced to halt its operations during the disruption,"

d. That protesters "bypassed [a] line of students waiting to check-in for the event" and "forced their way through[ the doors], pushing past staff," and

e. That "[m]any students were prevented from entering the event . . . while the fair was occupied by protesters."

*Id.*, ¶ 131.

After receiving the notices, plaintiffs asked Ms. Nelson for status updates on their interim exclusions and clarification on the exclusions' scope. *Id.* at 21, ¶ 133. For instance, plaintiffs asked Ms. Nelson whether the exclusions prohibited them from working scheduled shifts at their respective on-campus jobs. *Id.*, ¶ 134. On each occasion, Ms. Nelson "rebuffed or ignored plaintiffs" requests." *Id.*, ¶ 135. Due to the interim exclusions, plaintiffs were prohibited from attending the on-campus portions of their jobs. *Id.*, ¶ 140.

Mr. Cramer filed a police report against plaintiffs. *Id.* at 21-22, ¶ 141. The police report alleged the following:

inference with staff, faculty, or students of an educational institution; trespass within public buildings; harassment, strikes, shoves, or kicks with intent to intimidate or harass another person, in whole or in part, because of that person's actual or perceived race, color, religion, ancestry, national origin, physical or mental disability, sexual orientation, or transgender identity; and unlawful conduct on public property.

*Id.* at 22, ¶ 142. The Boulder District Attorney's Office has not prosecuted plaintiffs. *Id.*, ¶ 143. Defendants did not lift the exclusions until November 25, 2024. *Id.*, ¶ 146.

For the Fall 2024 semester, plaintiffs paid more than $800 in mandatory student fees, including an "Art and Cultural Enrichment Fee," "Athletic Fee," "Student Activity

Fee," recreation center fees, and other on-campus nonacademic benefits. *Id.* at 22-23, ¶ 150. Despite being prohibited from accessing on-campus benefits from October 4, 2024 to November 25, 2024, plaintiffs have not received any refund of the aforementioned fees. *Id.* at 23, ¶ 151.

## II.    LEGAL STANDARD

### A.  Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must allege enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . . plausible on its face." *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The 'plausibility' standard requires that relief must plausibly follow from the facts alleged, not that the facts themselves be plausible." *RE/MAX, LLC v. Quicken Loans Inc.*, 295 F. Supp. 3d 1163, 1168 (D. Colo. 2018) (citing *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008)). Generally, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Twombly*, 550 U.S. at 555) (alterations omitted). A court, however, does not need to accept conclusory allegations. *See, e.g.*, *Hackford v. Babbit*, 14 F.3d 1457, 1465 (10th Cir. 1994) ("we are not bound by conclusory allegations, unwarranted inferences, or legal conclusions").

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quotations

11

and alterations omitted); *see also Khalik*, 671 F.3d at 1190 ("A plaintiff must nudge [his] claims across the line from conceivable to plausible in order to survive a motion to dismiss." (quoting *Twombly*, 550 U.S. at 570)).  If a complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent," then plaintiff has not stated a plausible claim.  *Khalik*, 671 F.3d at 1191 (quotations omitted).  Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory."  *Bryson*, 534 F.3d at 1286 (alterations omitted).

### B.  <u>Qualified Immunity</u>

"Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  A court should resolve questions of qualified immunity at the earliest possible stage of litigation.  *Anderson v. Creighton*, 483 U.S. 635, 646 n.6 (1987).  However, a plaintiff facing a qualified immunity challenge still does not have a heightened pleading standard.  *Currier v. Doran*, 242 F.3d 905, 916-17 (10th Cir. 2001).

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Thus, to survive a motion to dismiss under Rule 12(b)(6) "where a qualified

immunity defense is implicated, the plaintiff 'must allege facts sufficient to show (assuming they are true) that the defendants plausibly violated their constitutional rights.'" *Hale v. Duvall*, 268 F. Supp. 3d 1161, 1164 (D. Colo. 2017) (quoting *Robbins v. Oklahoma ex rel. Dep't of Human Servs.*, 519 F.3d 1242, 1249 (10th Cir. 2008)).  When a defendant raises the defense of qualified immunity, a "plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct."  *T.D. v. Patton*, 868 F.3d 1209, 1220 (10th Cir. 2017) (internal quotation marks omitted).  Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case."  *Pearson*, 555 U.S. at 236.

## III.    ANALYSIS

Plaintiffs bring claims for First Amendment retaliation pursuant to 42 U.S.C. § 1983 against Mr. Cramer and Ms. Nelson, in their individual capacities, for money damages and against Mr. Schwartz, in his official capacity, for injunctive relief (Claim One); violation of the First Amendment right to freedom of speech and assembly pursuant to § 1983 against Mr. Cramer and Ms. Nelson, in their individual capacities, for money damages (Claim Two); violation of the Fourteenth Amendment right to due process against Mr. Cramer and Ms. Nelson, in their individual capacities, for money damages (Claim Three); violation of Colo. Rev. Stat. § 23-5-144 against the University for injunctive relief (Claim Four); and breach of contract against the University for

injunctive relief (Claim Five).  Docket No. 22 at 23-28.  Defendants move to dismiss all

of plaintiffs' claims.  *See generally* Docket No. 33.

### A.  <u>Claim One – First Amendment Retaliation</u>

In Claim One, plaintiffs allege that Mr. Cramer and Ms. Nelson retaliated against

plaintiffs for their protest on October 3, 2024 at the job fair by imposing the interim

exclusions and filing the police report.  Docket No. 22 at 23, ¶¶ 155, 158.  Generally,

"the First Amendment prohibits government officials from subjecting an individual to

retaliatory actions for engaging in protected speech."  *Nieves v. Bartlett*, 139 S. Ct.

1715, 1722 (2019) (internal quotation marks omitted).  To establish a First Amendment

retaliation claim, a plaintiff must demonstrate (1) that he or she was engaged in a

constitutionally protected activity; (2) that the defendant's action caused him or her to

suffer an injury that would chill a person of ordinary firmness from continuing to engage

in that activity; and (3) that the defendant's actions were substantially motivated as a

response to plaintiff's exercise of his or her First Amendment speech rights.  *Becker v.*

*Kroll*, 494 F.3d 904, 925 (10th Cir. 2007).

The Court considers the first element, whether plaintiffs were engaged in a

constitutionally protected activity at the job fair.  To determine whether plaintiffs' speech

is protected by the First Amendment, the Court must determine whether the UMC is a

traditional public forum, designated public forum, or nonpublic forum.  *See Church on*

*the Rock v. City of Albuquerque*, 84 F.3d 1273, 1278 (10th Cir. 1996) ("The

government's ability to restrict protected speech by private persons on government

property depends, in part, on the nature of the forum.").  While the complaint alleges

that the UMC is a traditional public forum or designated public forum, *see* Docket No. 22

at 11, ¶ 58, the allegations are consistent with the UMC being a designated public forum.  Traditional public fora are those that "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions."  *Brewer v. City of Albuquerque*, 18 F.4th 1205, 1219 (10th Cir. 2021) (citation omitted).  On the other hand, "[a] designated public forum is public property, not constituting a traditional public forum, which the government has intentionally opened to the public for expressive activity; so long as the government keeps this property open to expressive activity, it is bound by the same standards as apply in a traditional public forum."  *Id*. at 1219 n.12 (internal quotations and citation omitted).  "[D]esignated public fora are places that are not generally open to the public for First Amendment activity and are created by purposeful governmental action to allow speech activity."  *Evans v. Sandy City*, 944 F.3d 847, 853 (10th Cir. 2019) (internal quotation and citation omitted).  The UMC was "specifically designed to be a place of collaboration for University of Colorado students."  Docket No. 22 at 10, ¶ 49.  The complaint alleges that the UMC has "long been used as a forum for public protest and debate."  *Id*., ¶ 55.  The complaint alleges that the UMC is generally "open to the public, including nonstudents" and that "[s]tudent organizations often . . . hold events at the UMC."  *Id.*, ¶¶ 52, 54.  However, "publicly owned or operated property does not become a 'public forum' simply because members of the public are permitted to come and go at will."  *Hawkins v. City & Cnty. of Denver*, 170 F.3d 1281, 1287 (10th Cir. 1999) (citation omitted).  Based on these allegations, the Court finds that the UMC is a designated public forum.  *See Church on the Rock*, 84 F.3d at 1278 ("University facilities opened for meetings of registered student

15

organizations qualify as a designated public forum."); *Hawkins*, 170 F.3d at 1287

("designated public fora include: state university meeting facilities expressly made

available for use by students").

"Designated public fora differ from traditional public fora in that a State is not

required to indefinitely retain the open character of the facility." *Wells v. City & Cnty. of

Denver*, 257 F.3d 1132, 1145 (10th Cir. 2001) (internal quotation, alteration, and citation

omitted). Thus, the state "may instead choose to convert a designated public forum

back into a non-public forum because the government retains the choice regarding the

status of its forum." *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d

314, 323 (D.C. Cir. 2018) (internal quotation and citation omitted).

The Court finds, based on the allegations in the complaint, that the University

closed the Glenn Miller Ballroom (the "Ballroom") for the job fair and thus it was a

nonpublic forum at the time of plaintiffs' protest. "The government may limit speech in a

nonpublic forum to reserve the forum for the specific official uses to which it is lawfully

dedicated." *Summum v. Callaghan*, 130 F.3d 906, 916 (10th Cir. 1997). In a nonpublic

forum, the government can restrict access entirely "as long as the restrictions are

reasonable and are not an effort to suppress expression merely because public officials

oppose the speaker's view." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473

U.S. 788, 800 (1985) (internal quotation, alteration, and citation omitted).

The complaint alleges that the South Terrace was reserved for purposes of the

job fair and a barrier was erected separating the South Terrace from the rest of the

UMC. Docket No. 22 at 12, 13, ¶¶ 68, 77. "Reserving" a space for a nonpublic event

and then erecting a barrier between that space and public space is inconsistent with the

South Terrace being a traditional public forum.  The complaint alleges that the job fair was a "formal event for students."  *Id.* at 12, ¶ 69.  Thus, the job fair was not open to the public but rather was open to students attending the job fair.  The notices of the interim measures that the plaintiffs ask the Court to consider provide further support for the fact that the Ballroom was a nonpublic forum, stating that students were required to "check-in to the event" by presenting their "BuffOne Card" or "another form of ID" if the attendee was an alumni.  *See* Docket No. 52-1 at 2.  Only once "student or alumni status was verified" were attendees permitted to enter the Ballroom.  *See id.*  The complaint's allegations show that plaintiffs did not attempt to check-in as required for job fair attendees and that administrators attempted to stop plaintiffs from entering.  *See* Docket No. 22 at 15-16, ¶¶ 96-97.

Because the Ballroom was a nonpublic forum, "restrictions on expressive activity need only satisfy a requirement of reasonableness."  *Mocek v. City of Albuquerque*, 813 F.3d 912, 930 (10th Cir. 2015) (internal quotation and citation omitted).  The Tenth Circuit has acknowledged that most other circuits have held that whether the government's restrictions are reasonable is relevant for purposes of a First Amendment retaliation claim.  *See id.* at 931.  "The reasonableness of the Government's restriction on speech in a nonpublic forum must be assessed in light of the purpose of the forum and all the surrounding circumstances."  *Hawkins*, 170 F.3d at 1289 (alteration and citation omitted).  Given that the purpose of the Ballroom at the time of the protest was to facilitate the job fair, the Court finds that it was reasonable for the University to order that plaintiffs leave the job fair after they entered the Ballroom without showing identification, without properly checking in, and, once inside, used a bullhorn.  The Court

17

finds that it was reasonable for the University to restrict plaintiffs' protest to areas near the UMC, namely, the South Lawn. *See Cornelius*, 473 U.S. at 809 ("The First Amendment does not demand unrestricted access to a nonpublic forum merely because use of that forum may be the most efficient means of delivering the speaker's message."). The University did not ban plaintiffs' speech on the day of the protest, but rather only restricted plaintiffs from engaging in their protest in the Ballroom and required plaintiffs to protest on the South Lawn. *See* Docket No. 22 at 17-18, ¶¶ 107-113.

However, plaintiffs do not base their claims directly on their exclusion from the Ballroom or being restricted to the South Lawn to protest, but rather focus on the punishment that the University imposed on them afterwards, namely, the interim exclusions. On October 4, 2024, the University sent plaintiffs written notices of the Student Code of Conduct charges they were facing and the interim exclusions that were being imposed due to plaintiffs' conduct on October 3, 2024. *Id.* at 18-19, ¶¶ 118-122. Plaintiffs claim that the University imposed these exclusions in retaliation for plaintiffs' protected activity. *See id.* at 23, ¶ 158. The complaint alleges that the interim exclusions were based upon violations of the Student Code of Conduct. *See id.* at 18, ¶¶ 115, 120. While these regulations are content and viewpoint neutral, plaintiffs argue that the Student Code of Conduct charges were enforced against plaintiffs based on their viewpoints. *See* Docket No. 52 at 11. "Courts have recognized that selective enforcement of a neutral and facially constitutional law may run afoul of the First Amendment if the government's enforcement choices turn on the content or viewpoint of speech." *Fuller v. Salt Lake City*, 775 F. Supp. 3d 1212, 1224 (D. Utah 2025) (internal

18

quotation, alteration, and citation omitted).  "[C]ontent-based discrimination is

permissible in a nonpublic forum if it preserves the purpose of the forum."  *See*

*Summem*, 130 F.3d at 917.  However, even in a nonpublic forum, "when the

government moves beyond restricting the subject matter of speech and targets

particular views taken by speakers on a subject, such viewpoint discrimination is

presumed impermissible."  *See id.* (internal quotation and citation omitted).  The

complaint fails to plausibly allege that the University's removal of plaintiffs, imposition of

discipline, and filing of the police report was based on their viewpoints.  In support of

plaintiffs' argument, they cite the complaint's allegation that, at Mr. Cramer's behest,

SJP protestors were instructed to move to the South Lawn upon Mr. Cramer learning

that the purpose of the protest was to "express opinions against some of the companies

at the Career Fair."  Docket No. 22 at 13-14, 20, ¶¶ 77- 84, 130.  The complaint alleges

that the basis for the Student Code of Conduct Charges was not plaintiffs posing "any

continuing threat to persons or property or ongoing threat of disrupting academic

progress," but rather based on "negative reactions" to plaintiffs' protest, *id.* at 19-20,

¶¶ 128-29; that Mr. Cramer's report of the incident was "unequivocally refuted by

security footage," *id.* at 20-21, ¶ 131; that the interim exclusions remained in effect even

after Ms. Nelson reviewed the footage, *id.* at 22, ¶148; that the notice of charges

identified plaintiffs as SJP leadership and SJP was placed in bad standing, *id.* at 18,

¶¶ 114-117; that pro-Israel student groups and counter-protesters have received more

favorable treatment from the University, including where a counter-protester walked into

Glenn Miller Ballroom with SJP the day of the job fair, *id.* at 8-9, 15, ¶¶ 39-40, 93; and

that "the interim exclusion of a CU Boulder student is seldom imposed except where the

student is credibly alleged to be the perpetrator of physical or sexual violence, stalking, or repeated materially disrupted behavior." *Id.* at 19, ¶ 124.

While these allegations suggest that plaintiffs were punished more severely than expected, given the conduct that they were accused of and plaintiffs' lack of disciplinary history, these allegations do not plausibly allege that the discipline or police report was based on plaintiffs' viewpoints. Furthermore, the fact the video footage allegedly contradicted Mr. Cramer's account of the protest does not indicate that the interim exclusions were imposed or that the police report was filed based on plaintiffs' viewpoints. The investigation into plaintiffs' conduct being allegedly insufficient, without allegations that the insufficient investigation was based on a desire to punish plaintiffs for their SJP-aligned speech, also cannot support plaintiffs' claim.

In addition, plaintiffs' allegations regarding the University's more favorable treatment of SSI are too conclusory to demonstrate a viewpoint-based restriction on speech. The complaint does not allege that SSI, or another pro-Israel group, engaged in similar conduct to SJP on October 3, 2024, namely, entering a job fair not open to the public and using a bullhorn after being told to limit their protest to another area of the University. One counter-protester allegedly followed SJP members into the Ballroom to film, but the complaint does not allege or provide reason to believe that the counter-protester violated the Student Code of Conduct. Thus, this allegation does not show that plaintiffs were subjected to the interim exclusions based on the content of their speech. *See id.* at 15, ¶ 94. In sum, the complaint does not plausibly allege selective enforcement of the Student Code of Conduct that "was motivated by the protesters' message." *See Fuller*, 775 F. Supp. 3d at 1225 (finding that "Plaintiffs do not identify

anything in [defendant's] email, his deposition testimony, or anywhere else in the record that could support a justifiable inference that any selective enforcement of the curfew was motivated by the protesters' message, as opposed to the violence and destruction that accompanied the protests on May 30th and June 1st.").

Plaintiffs' retaliation claim alleges that the interim exclusions and filing of the police report were retaliatory acts in response to plaintiffs' protected speech at the job fair. Docket No. 22 at 23, ¶¶ 153, 158. Because the complaint fails to allege that their speech at the job fair was protected under the First Amendment, plaintiffs fail to satisfy the first element of a First Amendment retaliation claim that they were engaged in constitutionally protected speech. *See Blomquist v. Town of Marana,* 501 F. App'x 657, 659 (9th Cir. 2012) (unpublished) ("Because Plaintiffs lacked a First Amendment right to picket or otherwise occupy the site of the abandoned easement, they cannot establish that the individual defendants questioned, cited, or arrested them in retaliation for the exercise of their federal constitutional rights."). Given that plaintiffs fail to allege a First Amendment retaliation claim, the Court will dismiss Claim One without prejudice against Mr. Schwartz, who is sued in his official capacity and thus does not raise the defense of qualified immunity. *See* Docket No. 33 at 4-5. The Court finds that Mr. Cramer and Ms. Nelson are entitled to qualified immunity and will dismiss Claim One against them with prejudice.[3]

---

[3] Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case." *Pearson*, 555 U.S. at 236. Because plaintiffs fail to state a First Amendment retaliation claim, it will not address whether plaintiffs' clearly established right were violated.

**B.  Claim Two – First Amendment Freedom of Speech Claim**

Plaintiffs claim that the interim exclusions violated plaintiffs' First Amendment rights "because they prohibited Plaintiffs from engaging in First Amendment protected activity on campus."  Docket No. 22 at 24, ¶ 168.  The complaint alleges that the interim exclusions were "intended to suppress Plaintiffs' speech based on its content, and more specifically, Plaintiffs' viewpoint" and that they were "overbroad, unreasonable, and not narrowly tailored to serve a significant government interest."  *Id.* at 25, ¶¶ 169-70.

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech."  U.S. Const. amend. I; *see also Brewer*, 18 F.at 1217; *iMatter Utah v. Njord*, 774 F.3d 1258, 1263 (10th Cir. 2014) ("At its core, 'the First Amendment reflects a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" (quoting *Boos v. Barry*, 485 U.S. 312, 318 (1988))); *Pahls v. Thomas*, 718 F.3d 1210, 1229 (10th Cir. 2013) ("government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." (quoting *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95 (1972))).  "By incorporation through the Fourteenth Amendment, this prohibition applies to states and their political subdivisions."  *Aptive Env't, LLC v. Town of Castle Rock*, 959 F.3d 961, 979 (10th Cir. 2020).  "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys."  *Swanson v. Griffin*, 2022 WL 570079, at *3 (10th Cir. Feb. 25, 2022) (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995).

In order state a First Amendment freedom of speech claim, plaintiffs must show the interim exclusions prohibited plaintiffs' protected speech and that, based on the

nature of the forum where their speech is prohibited, the University's "justifications for excluding" plaintiffs fail to "satisfy the requisite standard" associated with the forum at issue. *See Summum*, 130 F.3d at 913.  The Court finds that plaintiffs' First Amendment claim fails because the complaint does not specify the speech that the interim exclusions allegedly prohibited.  Rather, the complaint alleges that the interim exclusions "prohibited Plaintiffs from engaging in First Amendment protected activity on campus."  Docket No. 22 at 24, ¶ 168.  This conclusory allegation is insufficient to show that the interim exclusions prohibited plaintiffs' protected speech.  Moreover, the Court is not obligated to accept this allegation, which is contradicted by the notices.  *See Openwater Safety IV, LLC*, 2018 WL 11435659, at *5.  The interim exclusions explained in the notices do not mention any protected speech that plaintiffs are prohibited from engaging in and they do not prohibit plaintiffs from engaging in First Amendment protected speech while going to, attending, or leaving classes.  *See* Docket No. 52-1 at 7-8.  The complaint does not allege that the interim exclusions prevented plaintiffs from engaging in any particular protected speech.  "[T]he First Amendment does not prevent restrictions directed at . . . conduct from imposing incidental burdens on speech." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011).  Thus, the Court finds that plaintiffs fail to allege that interim exclusions prohibited plaintiff's speech and fail to plausibly allege that their First Amendment rights were violated.  Accordingly, the Court finds that Mr. Cramer and Ms. Nelson are entitled to qualified immunity and will dismiss Claim Two.

C. **Claim Three – Fourteenth Amendment Due Process Violation**

Plaintiffs claim that Mr. Cramer and Ms. Nelson violated plaintiffs' Fourteenth Amendment rights by imposing the interim exclusions "without any pre- or post-deprivation hearing."  Docket No. 22 at 26, ¶ 179.  Plaintiffs claim that they "enjoy a property interest in their status as students and continued education at the university," which they were deprived of by the interim exclusions.  *See id.* at 25-26, ¶¶177-180.

### 1. *Constitutional Violation*

In analyzing a procedural due process claim, "courts must engage in a two-step inquiry: (1) did the individual possess a protected interest such that the due process protections were applicable; and, if so, then (2) was the individual afforded an appropriate level of process."  *Brown v. Montoya*, 662 F.3d 1152, 1167 (10th Cir. 2011) (citation omitted).  "The essence of procedural due process is the provision to the affected party of some kind of notice and some kind of hearing."  *Moore v. Bd. of Cnty. Comm'rs of Cnty. of Leavenworth*, 507 F.3d 1257, 1259 (10th Cir. 2007) (internal alterations, quotations, and citation omitted).

The following factors are relevant to whether an individual was afforded an appropriate level of process: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  *Hattrup v. United States*, 845 F. App'x 733, 737 (10th Cir. 2021) (unpublished) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

The complaint alleges that plaintiffs "each enjoy a property interest in their status as students and continued education at the University." Docket No. 22 at 25, ¶ 177. Defendants argue that plaintiffs fail to plausibly allege a protected interest that implicates their right to due process. *See* Docket No. 33 at 11. Defendants argue that "there is no property interest in unfettered access to campus." *Id.* at 12.

Plaintiffs have a property interest in their public education. *See Gaspar v. Bruton*, 513 F.2d 843, 850 (10th Cir. 1975) ("the State is constrained to recognize a student's legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause and which may not be taken away for mis-conduct without adherence to the minimum procedures required by the clause") (citation omitted). The question is whether the interim exclusions interfered with plaintiffs' property interest in their education. Pursuant to the interim exclusions, plaintiffs were only permitted to be on campus to attend classes. Thus, they could not attend the on-campus portion of their jobs, participate in student groups, or attend other on-campus events. The Court disagrees that the temporary nature of the exclusions and plaintiffs being permitted to attend classes means that their property interest was not interfered with. A campus ban, even if temporary, can nonetheless interfere with a student's property interest in the "educational process," especially where plaintiffs were banned from campus for nearly two months. *See Goss v. Lopez*, 419 U.S. 565, 576 (1975) (holding that a school suspension of 10 days interfered with plaintiffs' property interest in their publication education). Furthermore, students' interest in their public education extends beyond being able to attend classes. The "educational process" is "a broad and comprehensive concept with a variable and indefinite meaning." *See Albach v.*

25

*Odle*, 531 F.2d 983, 985 (10th Cir. 1976).  "It is not limited to classroom attendance but includes innumerable separate components, such as participation in athletic activity and membership in school clubs and social groups, which combine to provide an atmosphere of intellectual and moral advancement."  *Id.; see Caldwell v. Univ. of New Mexico Bd. of Regents*, 679 F. Supp. 3d 1087, 1170 (D.N.M. 2023) (finding that plaintiffs' "campus ban interferes with the educational process[ ] entirely, and not just a single component, because [plaintiff] can attend only one in-person class, and cannot participate in school athletics, school clubs, or social groups") (footnote omitted).  Accordingly, the Court finds that defendants interfered with plaintiffs' property interest in their public education.[4]

Turning to whether plaintiffs were afforded an appropriate level of process, the complaint alleges that defendants did not afford plaintiffs an opportunity to be heard and that they were not afforded any pre- or post-deprivation hearings.  Docket No. 22 at 25-26, ¶¶178-179.  The notices received by plaintiffs did not provide an opportunity for a hearing or appeal to challenge the interim exclusions.  *Id*. at 19, ¶ 123.  "At the very minimum . . . students facing suspension and the consequent interference with a protected property interest must be given some kind of notice and afforded some kind of

---

[4] The complaint alleges that the interim exclusions interfered with plaintiffs' liberty interests.  *See* Docket No. 22 at 25-26, ¶¶ 178-179.  "The Due Process Clause also forbids arbitrary deprivations of liberty.  Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, the minimal requirements of the Clause must be satisfied."  *Goss*, 419 U.S. at 574 (internal quotations and citation omitted).  The complaint does not allege that the interim exclusions resulted in damage to plaintiffs' good name, reputation, honor, or integrity.  Furthermore, in response to defendants' motion to dismiss, plaintiffs only contend that the interim exclusions interfered with a property interest in their public education.  *See* Docket No. 52 at 12-14.  Accordingly, the Court only considers plaintiffs' property interest in analyzing their due process claim.

hearing." *Goss*, 419 U.S. at 579.[5]  Defendants do not contend that they provided

plaintiffs with process.  *See* Docket No. 33 at 11-13.

Because plaintiffs have plausibly alleged that Mr. Cramer and Ms. Nelson

interfered with their property interest, without affording plaintiffs process, they have, at

this stage of the case, plausibly stated a Fourteenth Amendment due process claim.

### 2.  *Clearly Established*

The Court finds that plaintiffs had a clearly established right to due process upon

imposition of the interim exclusions.  It was clearly established that plaintiffs have a

property interest in their public education that encompasses, not only their interest in

attending classes, but also their interest in other on-campus aspects of their education

"which combine to provide an atmosphere of intellectual and moral advancement."  *See*

*Albach,* 531 F.2d at 985.  It was clearly established that the interim nature of the

exclusions does not change this property interest.  *See Goss*, 419 U.S. at 581

("Students facing temporary suspension have interests qualifying for protection of the

Due Process Clause").  Because Mr. Cramer and Ms. Nelson interfered with plaintiffs'

property interest, it was clearly established that plaintiffs were entitled to process which,

---

[5] The Court notes that the notices imposing the interim exclusions indicated that a "resolution meeting" was scheduled for Wednesday, October 9, 2024.  Docket No. 52-1 at 7.  However, the Court finds that the complaint plausibly alleges that no meeting or hearing was held regarding imposition of the interim measures.  The complaint alleges that the notices did not provide for a hearing or appeal to specifically challenge the interim measures, and the "resolution meeting" appears to be directed at resolution of the Student Code of Conduct charges and not the interim measures themselves.  *See* Docket No. 22 at 19, ¶ 123.  The complaint alleges that they requested multiple times to speak with Ms. Nelson regarding the interim exclusions and that such requests were "rebuffed or ignored."  *See id.* at 21, ¶¶ 133-135.  Furthermore, the interim measures were not resolved for two months.  *Id.* at 22, ¶ 146.

at the minimum, had to include notice and a hearing regarding imposition of the interim exclusions.  *See id.* at 579.

Accordingly, the Court finds that plaintiffs have met their burden to overcome Mr. Cramer and Ms. Nelson's qualified immunity defense.  The Court will deny defendants' motion to dismiss Claim Three.

### D. <u>Claims Four and Five – Violation of Colo. Rev. Stat. § 23-5-144 and Breach of Contract</u>

Defendants argue that the Claims Four and Five, which are asserted against the University, are barred by the Eleventh Amendment.  Docket No. 33 at 14.  The Eleventh Amendment bars suit against non-consenting states by private individuals in federal court.  *See Bd. of Trustees of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001).  However, "a state may waive its sovereign immunity by consenting to suit in federal court."  *MCI*, 216 F.3d at 935.  The test for determining whether a state consents to suit is a "stringent one."  *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675 (1999) (citation omitted).  A "State does not consent to suit in federal court merely by consenting to suit in the courts of its own creation."  *Id.* at 676.

Plaintiffs argue that the University consented to suit pursuant to Colo. Rev. Stat. § 23-5-144.  Docket No. 52 at 15.  Colo. Rev. Stat § 23-5-144 states in relevant part:

> The first amendment of the United States constitution and article II, section 10 of the Colorado constitution each protect the right to free speech, including the speech of students enrolled at public institutions of higher education.  The general assembly declares that it is a matter of statewide interest to protect the rights of students to exercise their freedom of speech on the campuses of public institutions of higher education, while recognizing the right of those institutions of higher education to enact reasonable time, place, and manner restrictions that preserve their ability to fulfill their educational missions.  At the same time, the general assembly declares that student expression on the campuses of institutions of higher education is a vital component of the educational environment at these institutions of higher education and that promoting the free

and unfettered exchange of ideas in this marketplace of ideas is one way in which these institutions of higher education fulfill their educational missions.

Colo. Rev. Stat. § 23-5-144(1)(a).  Section 23-5-144 further provides that:

Any student who has been denied access to a student forum for expressive purposes protected by this section may bring an action in a court of competent jurisdiction to enjoin any violation of this section or to recover reasonable court costs and attorney fees.

Colo. Rev. Stat. § 23-5-144(6).  The Court finds that the University did not consent to suit pursuant to § 23-5-144.  Section 23-5-144's reference to the U.S. Constitution and authorizing suits in a court of competent jurisdiction is a not a "clear declaration" that the University "intends to submit itself" to the federal court's jurisdiction.  *See Coll. Sav. Bank*, 527 U.S. at 676 (a state does not consent to suit "even by authorizing suits against it in any court of competent jurisdiction") (internal quotations and citation omitted).  Accordingly, the Court will grant defendants' motion to dismiss Claims Four and Five.[6]

## IV.    CONCLUSION

Therefore, it is

**ORDERED** that Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint Under F.R.C.P. 12(b)(1) and 12(b)(6) [Docket No. 33] is **GRANTED in part and DENIED in part**.  It is further

**ORDERED** that plaintiffs' first claim is **DISMISSED without prejudice** against defendant Schwartz.  It is further

---

[6] Plaintiffs concede that "Count 5 should be dismissed without prejudice."  Docket No. 52 at 16.  The Court agrees and finds that the University is immune from suit on Claim Five because none of the exceptions to Eleventh Amendment immunity apply.  *See MCI*, 216 F.3d at 935.

**ORDERED** that plaintiffs' first and second claim are **DISMISSED with prejudice**

against defendants Cramer and Nelson.[7]  It is further

**ORDERED** that plaintiffs' fourth and fifth claim are **DISMISSED without**

**prejudice**.

DATED March 31, 2026.

BY THE COURT:

PHILIP A. BRIMMER
United States District Judge

---

[7] Plaintiffs request that any dismissal be without prejudice due to events that occurred after the filing of defendants' motion to dismiss.  Docket No. 52 at 15.  On May 20, 2025, Ms. Nelson issued a final decisions on plaintiffs' disciplinary charges.  *Id.*  Ms. Nelson "notably found that Plaintiffs did *not* materially and substantially disrupt the career fair."  *Id.*  Plaintiffs contend that this confirms that "the interim exclusion was not imposed to serve any legitimate disciplinary objective contemplated by Section L(2) of the Student Code of Conduct."  *Id.*  The Court does not believe this subsequent development affects the analysis.  Generally, a claim that is subject to dismissal based on qualified immunity should be dismissed with prejudice.  *See Clark v. Wilson,* 625 F.3d 686, 692 (10th Cir. 2010) (instructing the district court to grant defendants' motion to dismiss based on qualified immunity "with prejudice"); *McCrary v. Jones*, 2015 WL 873641, at *6 (W.D. Okla. Feb. 27, 2015) (dismissing claim with prejudice where defendant was entitled to qualified immunity).  Thus, the Court finds that dismissal of plaintiffs' first and second claim against Mr. Cramer and Ms. Nelson should be with prejudice.